446 So.2d 1258 (1984)
STATE of Louisiana
v.
Claude MARQUER, Sr., Claude Marquer, Jr., and Esther Marquer.
No. KA-0377.
Court of Appeal of Louisiana, Fourth Circuit.
February 13, 1984.
Rehearing Denied March 21, 1984.
Writs Denied May 11 and May 18, 1984.
*1260 Harry F. Connick, Dist. Atty., William R. Campbell, Asst. Dist. Atty., Orleans Parish, New Orleans, for State of La.
J. Samuel Shambra, New Orleans, Clifford E. Poché, Jefferson, for defendants-appellants.
Before GULOTTA, KLEES and WARD, JJ.
KLEES, Judge.
The three defendants in this case were charged with distribution of a controlled dangerous substance, namely pentazocine. At their arraignment, all three defendants pled not guilty. On February 15, 1982, after a five day jury trial, all of the defendants were found guilty as charged. The defendants now perfect this appeal, seeking to overturn their convictions for violating LSA-R.S. 40:969.

FACTS
The defendants operated a pharmacy in New Orleans East for many years. Claude Marquer, Jr. was the owner of the business and worked as the pharmacist during the day. Esther and Claude Marquer, Sr. were also pharmacists and they generally worked alternate nights at the pharmacy. A cousin, Jesse Carlock, also worked at the pharmacy as an apprentice, but the three defendants were the only pharmacists employed at the drug store during 1980.
Sometime during 1980, the Narcotic and Drug Abuse Section of the New Orleans Police Department began an investigation of the Marquer Pharmacy involving suspected trafficking in pentazocine and pyribenzamine, better known on the street as "T's and Blues". The pharmacy was placed under surveillance. As a result of this surveillance, combined with information from confidential informants, several people were stopped by the police after leaving the store. Pentazocine and pyribenzamine were seized from these people.
On June 18, 1980, Ruby Holmes a/k/a Hazel White, was arrested a few blocks from the Marquer Pharmacy. While at police headquarters she was searched and bottles of tablets were confiscated from her. Samples taken from two of the bottles proved to be pentazocine (hereinafter referred to as Talwin). Inside the confiscated bottles were "Albert and Wegmann Pharmacy" labels with the same address as the Marquer Pharmacy. These labels contained no directions for use of the drugs.
Ms. Holmes, an admitted ex-convict and former drug-addict, testified that she went to the Marquer Pharmacy everyday and would buy fifty to one hundred pills each time as well as other items. She testified that she used forged prescriptions to get Talwin and pyribenzamine. She identified some of the forged prescriptions she passed at the Marquer's store and testified that she had been passing these forged prescriptions daily for over six months. She also identified two of the defendants as the pharmacists who worked at the store when she passed the forged prescriptions.
*1261 On October 10, 1980, Robert Melancon and Norris Odom were stopped by Sargeant James Lewis a few blocks from the Marquer Pharmacy. Sgt. Lewis testified that he advised them they were not under arrest, but that the police were conducting an investigation of the Marquer's store and their help would be appreciated. Mr. Melancon then turned over to Sgt. Lewis two vials, each containing fifty pills. Ms. Odom also turned over two vials of fifty pills each. These four vials were later found to contain Talwin and pyribenzamine.
Robert Melancon, also an ex-convict and drug user, testified that every day he and his ex-wife Norris Odom would go to Marquer's store and pass forged prescriptions for Talwin and pyribenzamine. However, after Ruby Holmes was arrested, they would only go every other day. He testified that because they went there around 6:00 p.m., Esther or Claude Marquer, Sr. would usually be on duty. He would put his prescription on the counter but, he admitted that he never paid attention to who actually picked up the prescription. He identified some of the forged prescriptions he passed.
Mr. Melancon testified that a young man by the name of Jesse worked at the pharmacy and he (Jesse) would sell Talwin and pyribenzamine to others without a prescription. However, Jesse was not there every time Melancon and Odom went into the store.
Norris Odom's testimony was substantially the same as Melancon's testimony. She identified all three defendants and testified that all three had filled her forged prescriptions at one time or another. These prescriptions were for one hundred Talwin, but she was usually only given fifty at a time. She identified some of the prescriptions she had passed at the defendant's store and testified that the defendants never questioned her about the use of different names on the prescriptions even though Esther and Claude Sr. knew and called her by her real name.
She further testified that she and Melancon weren't forced to buy extra non-drug items but were told that such purchases would better their chances of getting their prescriptions filled. Jesse would sometimes sell Talwin to her without a prescription, however, she never remembered seeing Jesse working there by himself.
On November 4, 1980, Thelma Jones was stopped by Det. David Peralta near the Marquer Pharmacy. She turned over to him two hundred pills, half of which were found to be Talwin and half which were pyribenzamine. Ms. Jones testified that she had just left the pharmacy when she was stopped.
Ms. Jones testified that she visited the Marquer pharmacy every night for at least six months. She would put forged prescriptions on the counter and then pick up other items. She would present prescriptions for one hundred pills but would generally receive only fifty. She testified that on occasion the defendants would refuse to fill her prescriptions, particularly after Ruby Holmes was arrested. She identified in court some of the prescriptions she passed at the pharmacy, including some that were written in two colors of ink and some where she had used "white-out" to change a name on the prescription.
Jesse Carlock, a cousin of the defendants, had worked at the Marquer Pharmacy since 1969. At the time of the alleged offense he was working as an apprentice intern pharmacist. He had originally obtained a permit to work as an intern in connection with his studies in pharmacy.
In 1978, he was arrested for forging prescriptions and was placed on the District Attorney's Diversionary Program. The charges were eventually dropped, but Mr. Carlock never returned to school. He did, however, continue to work at the pharmacy. He testified that Claude Marquer, Jr. would work at the pharmacy during the day, while Esther and Claude Sr. would alternate the night shift. He also testified that Claude Jr. kept the books of the store and paid the bills, but that he and all three defendants would place the drug orders.
*1262 Mr. Carlock testified that Ruby Holmes, Robert Melancon, Norris Odom, and Thelma Jones, among others, would visit the pharmacy daily to buy Talwin and pyribenzamine. He testified that Claude Sr. and Esther were friendly with Thelma Jones and with Norris Odom. According to Mr. Carlock's testimony, Claude Jr. told his employees to fill questionable prescriptions only for people they recognized. Claude Jr. also instructed them to use Albert and Wegmann labels inside these prescription bottles.
Carlock testified that he often told these people to buy household goods in addition to the drugs in order to ensure that their prescriptions would be filled. In addition, he testified that whenever one of these regular "T's and Blues" customers would get arrested, he and the defendants would stop filling the prescriptions for a while.
On cross-examination, Mr. Carlock testified that he personally sold Talwin and pyribenzamine to some of these regular customers, without a prescription, keeping the money for himself.
Mr. Charles Favro, the Chief Inspector for the Louisiana Board of Pharmacy, who was qualified as an expert in the field of drug accountability audits, testified as to an audit conducted at the Marquer Pharmacy. The November, 1980 audit was primarily concerned with the store's records dealing with Talwin and pyribenzamine tablets. As a result of the audit, Mr. Favro found several violations of state and federal regulations pertaining to pharmacies.
Mr. Favro also took an inventory of the Talwin and pyribenzamine that had been handled by the Marquer Pharmacy from January 1 to November 12, 1980. He concluded that there was a shortage of 20,904 Talwin and 22,861 pyribenzamine tablets.
Mr. Favro testified that out of 20,893 prescriptions filled by the Marquer Pharmacy between January 1 and November 12, 1980, 1,944 were for Talwin and 2,208 were for pyribenzamine. These two drugs together accounted for approximately 20% of the total prescriptions filled during that period. Mr. Favro also testified:
"I have never in my work encountered any other store ... that has dispensed near this ... high percentage of either one of these drugs."
Over defense objection, Mr. Anthony Pepperoni testified that he was the supervisor of a K & B Drug Store located on Chef Menteur Highway a few blocks from the Marquer Pharmacy. As a result of a subpoena duces tecum, he surveyed the records of this K & B store for the period from January through November, 1980. He testified that of a total of 29,853 prescriptions filled by that store during this period only ninety-eight were for Talwin, a total of 3,789 tablets.
Det. David Peralta testified that on November 12, 1980, he served a search warrant on the Marquer Pharmacy. Pursuant to this warrant, he and other officers seized prescriptions for Talwin and pyribenzamine issued in the names and aliases of Thelma Jones, Ruby Holmes, Norris Odom, and Robert Melancon. They recovered a total of 674 prescriptions, 344 of which were for Talwin and 340 of which were for pyribenzamine, many of which were filled back-to-back.
Det. Larry Taplin, who was qualified as an expert in the field of drug abuse and distribution of drugs in New Orleans, was present when the Marquer Pharmacy was searched and when the Marquers were arrested. Det. Taplin testified, over defendants' continuing objection, to local trends in the purchases and prices of Talwin and pyribenzamine on the street from 1978 through the time of the defendants' arrests.
The defense presented seventeen character witnesses, including some public figures. All of the witnesses testified that the defendants' reputations in the community were excellent.
Claude Marquer, Jr. was the only defendant to take the stand. He testified that he worked in the store during the day and the other two defendants would work alternate nights. He took care of the books, wrote the checks to the drug wholesalers, and *1263 ordered most of the drugs needed by the pharmacy. Marquer testified that Jesse Carlock worked at the pharmacy from 1969 until the time of the defendants' arrest, but that he was always under the impression that Jesse had returned to pharmacy school.
Claude Marquer, Jr. testified that he sold the pharmacy to the Albert and Wegmann chain in 1975 but remained as the manager of the store. However, he repurchased the store in 1977. He testified that he had two to three cases of Albert and Wegman labels left over when he repurchased the pharmacy, and that when his supply of "Marquer" labels ran out he would sometimes use the Albert and Wegmann labels.
He testified that although for a time his pharmacy was the only one in the area, the opening of the K & B and other pharmacies in that area did not harm the business. Mr. Marquer stated that while he would scrutinize any prescriptions he received, he would generally leave the administrative details such as typing the labels and stamping his name on the prescriptions to Jesse or whoever was working with him.
Mr. Marquer testified that the only state witness he recognized as a customer was Ruby Holmes and that he did not see her in the store every day. At one point, he testified that he filled back-to-back prescriptions for Talwin and pyribenzamine for Hazel White (Ruby Holmes) forty-five to fifty times. However, later he testified that any one of the three defendants could have filled those prescriptions for Ms. Holmes. He also testified that he was unaware that "Hazel White" was not Ruby Holmes' real name and he admitted that he knew she had been arrested in June, 1980.
In court, Mr. Marquer identified prescriptions seized from his store that contained his name stamp. He testified that he did not knowingly fill any illegal prescriptions nor did he authorize any of the others in the store to do so. He disclaimed any knowledge of Jesse Carlock's sale of pills without a prescription. He did admit that during 1980, he was aware of the street abuse of Talwin and pyribenzamine. Finally, he testified that he was surprised by Mr. Favro's findings that approximately 10% of the prescriptions filled by the Marquer Pharmacy from January to November, 1980 were for pyribenzamine and that approximately 9.8% were for Talwin.
After considering the testimony and evidence presented at trial, the jury found the defendants guilty as charged of illegal distribution of pentazocine.
The defendants appealed their conviction and originally presented twenty-two assignments of error. However, only seven assignments were addressed in brief. The merits of these assignments are considered below.

Assignments of Error I and II
Appellants' assignments of error one and two deal with the district attorney's reference during their voir dire to Talwin as a "narcotic", as well as "dope". Appellants argue that the use of such terms is inaccurate and highly inflammatory.
The appellants argue that this case did not involve narcotics and that the use of this term "inflamed" the jury. The prosecutor indicated that he intended to prove that Talwin was a "synthetic narcotic". The defense then asked the judge to instruct the jury to disregard any such comments. The prosecutor maintained that he would continue "to keep mentioning narcotics throughout this entire trial because ... We're talking about narcotic evidence."
The defense counsel asked for a mistrial based upon the prosecutor's comments. The court overruled the objection and denied the motion for mistrial. The defense counsel then registered a continuing objection to any reference to narcotic drugs.
Appellants assert that the court erred in its failure to sustain the objections to these comments. Because such comments were "completely prejudicial", appellants urge that a mistrial should have been declared.
La.R.S. 40:961 defines narcotic drugs as follows:
"Narcotic Drug" means any of the following, whether produced directly or indirectly *1264 by extraction from substances of vegetable origin, or independently by means of chemical systhesis, or by a combination of extraction and chemical synthesis:
(a) Opium, coca leaves, and opiates;
(b) A Compound, manufacture, sale, derivatives, or preparation of opium, coca leaves, or opiates;
(c) A substance and any compound, manufacture, salt, derivative, or preparation thereof which is chemically identical with any of the substances referred to in Subparagraphs (a) and (b) of this Paragraph, except that the words "narcotic drug" as used in this Part shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.
Appellant is correct in his assertion that Talwin does not fit this strict legal definition. However, testimony was introduced at trial that Talwin medically may be considered a narcotic drug. Dr. Monroe Samuels, who was qualified by the court as a medical doctor with expertise in the use and abuse of licit and illicit drugs, testified that Talwin was originally marketed as a non-narcotic drug. However, he noted, it was soon found to have addictive properties like narcotic drugs.
When asked for his medical definition of a narcotic drug, Dr. Samuels replied:
"A narcotic drug to me is one which produces narcotics. In other words, makes one depressed as say opium or heroin or morphine or demarol, and, in my opinion, pentazocine, and one which given often enough will produce addiction in the individual, which if the drug is withdrawn the individual will suffer from withdrawal symptoms."
When asked to distinguish his definition from the one set forth in La.R.S. 40:961, Dr. Samuels replied:
"The mere fact that this does not necessarily include any of the compounds which are structurally related to opium or morphine doesn't make me change my mind that this is not a narcotic drug ... If it acts the same way, then I consider it to be a narcotic."
It is debatable whether the district attorney was in error when he referred to Talwin as a narcotic drug. Although it does not strictly fit the legal definition of a narcotic drug, it is apparent that the drug does have properties that would compel at least one expert to call Talwin a narcotic drug. Even if this court were to find that these "narcotic" references were error, we do not consider such error to affect the substantial rights of the appellants. We conclude any such error to be harmless, and reversal of appellants' conviction is not necessary. See La.C.Cr.P. art. 921 and State v. Gibson, 391 So.2d 421 (La.1980).
Appellants also cite as error the trial court's refusal to grant a mistrial due to the prosecutor's comments. The grounds for a mandatory mistrial for statements made by a prosecuting attorney, as set forth in C.Cr.P. art. 770, include statements referring to: (1) race, religion, color, or national origin when such statements are irrelevant and might cause prejudice; (2) other crimes committed by the defendant that are inadmissible at trial; (3) the failure of the defendant to testify; (4) a judge's refusal to direct a verdict. C.Cr.P. art. 771 provides for the admonition by the judge on request to disregard any statement made by the prosecutor which is "irrelevant or immaterial and of such a nature that it might create prejudice against the defendant ... in the mind of the jury". The court may also grant a mistrial in these cases.
Here the prosecutor's remarks clearly did not meet the criteria for mandatory mistrial. The trial judge found these remarks to be harmless and elected not to declare a mistrial. His refusal was not error.

Assignment of Error No. III
By their assignment of error number three, appellants allege that the trial court erred by allowing the district attorney to argue the State's case during his opening statement. Appellants specifically point to *1265 statements made by Assistant District Attorney Chester where he refers to the Marquers' as running a "dope business" as well as having "dope addict" friends and partners. Appellants contend that such comments were beyond the scope of the opening statement in addition to being "inflammatory".
The scope of opening statement by the state is set forth in C.Cr.P. art. 766, which provides:
The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.
The Supreme Court, however, has consistently held that the trial judge has wide discretion in determining the scope of the opening statement, and his findings will not be disturbed absent a showing of abuse. State v. McClinton, 399 So.2d 178 (La.1981); State v. Kinchen, 342 So.2d 174 (La.1977).
Appellants have not shown that the Assistant District Attorney's statements went beyond the scope of the opening statement. The trial judge ruled that these statements were made in explanation of the state's theory of the case, and the appellants have shown no abuse of the judge's discretion in this ruling. Appellants' assignment of error number three is without merit.

Assignment of Error No. VI
By their assignment of error number six, appellants contend that the trial court erred by admitting the testimony of Detective Larry Taplin as to trends in the sale of "T's and blues". Appellants contend that such testimony was irrelevant and "the rankest form of hearsay", the only purpose of which was to "inflame the passions of the jury" against them.
Detective Taplin was qualified as an expert in the field of drug abuse and distribution of drugs in New Orleans. Detective Taplin explained what "T's and blues" were and how they were used by drug abusers in the community. The trial court, in response to hearsay objections, ruled that Detective Taplin could testify only to statistics gathered by him alone or in conjunction with someone else. Detective Taplin then testified as to the trend toward the rising use of T's and blues from 1979 to the date of trial. He noted that the number of arrests for T's and blues almost doubled from 1979 and 1980. Since he testified from his own personal experience, this testimony was not hearsay.
The next objection to the testimony was that it was irrelevant.
Relevant evidence is defined by La.R.S. 15:441 as:
Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent. Facts necessary to be known to explain fact, or which support an inference raised by such fact, are admissible.
Our Supreme Court has held that the trial court has wide discretion in determining the relevancy of the evidence presented, and such determination will not be overturned absent clear abuse of this discretion. State v. Chaney, 423 So.2d 1092, 1099 (La.1982); State v. Huizar, 414 So.2d 741, 748 (La.1982); State v. Bates, 397 So.2d 1331, 1335 (La.1981).
The witness testified as to how Talwin is used, what its physical effects are, how it is packaged, its price and how it is related to pyribenzamine. One of the facts that came out through the testimony of the four addict witnesses was that they always bought Talwin and Pyribenzamine in equal numbers from the appellants. The expert's testimony corroborates the fact that Talwin and Pyribenzamine are almost always used together. The expert witness testified that one of the reasons why Talwin has become a heroin substitute was that its quality control was much better because it was a mass produced drug from legitimate pharmaceutical companies. All of the evidence presented through Det. Taplin was extremely relevant information that corroborated *1266 portions of the State's case. Therefore this assignment of error is without merit.

Assignment of Error XII
By their assignment of error number twelve, appellants argue that the trial court erred by allowing the state to introduce statistical evidence that was not supplied to the defense until just prior to its introduction. Appellants contend that the state's inaction by waiting until the last minute to supply this evidence to the defense effectively denied their rights to discovery.
Mr. Anthony Pepperoni, manager of a K & B Drug Store located near the Marquer Pharmacy, testified that he surveyed the records of his store from January to November, 1980 pursuant to a subpoena duces tecum. Mr. Pepperoni testified to the total number of prescriptions filled by his store as well as the amount of Talwin prescriptions filled during that time. There was no physical evidence introduced as to this survey.
Prior to Mr. Pepperoni's testimony, the defense counsel objected to any testimony dealing with a statistical analysis compiled at any drug store other than the Marquer Pharmacy on the ground that he was not furnished with any discovery material pertaining to this survey. Defense counsel conceded that this analysis may not have been available to the state when other discovery material was furnished, but he pointed out the state's continuing duty to supply requested discovery material. He noted that even if mere testimony were admitted, such testimony would unduly prejudice the defendants because they did not have adequate time to secure experts to rebut this testimony.
The prosecutor argued that the motion for subpoena duces tecum had been filed into the record two days before trial actually began. He noted that his amended answer to the defense discovery motion was filed into the record just prior to the beginning of trial and noted that he gave the document to defense counsel as soon as he received it.
Pursuant to C.Cr.P. art. 718(2), a defendant may inspect, copy, etc. any books, papers, documents, photographs, etc. within the custody, possession, or control of the state if the state intends to use such material as evidence at trial. Additionally, the state has a continuing duty under C.Cr.P. art. 729.3 to disclose such evidence when it comes within the state's control. State v. Strickland, 398 So.2d 1062, 1067 (La.1981).
The Supreme Court has long held that the purpose of the discovery rules as set forth by the Code of Criminal Procedure is to "eliminate unwarranted prejudice which could arise from surprise testimony." State v. Mitchell, 412 So.2d 1042, 1044 (La.1982); State v. Toomer, 395 So.2d 1320 (La.1981). However, failure by the state to disclose will not automatically require reversal of a conviction. The defendant must prove that he was prejudiced by the state's failure to disclose before a reversal is warranted. State v. Arnaud, 412 So.2d 1013 (La.1982); State v. Mitchell, supra; State v. Strickland, supra.
In State v. Ray, 423 So.2d 1116 (La. 1982), the Supreme Court noted that in order to justify reversal of a conviction, the reviewing court:
"... must review the record for a determination of whether any prejudice which may have resulted from the non-compliance caused the trier of fact to reach to wrong conclusion." 423 So.2d 1116, 1119
In Ray, the Court held that the non-disclosure of a "meal card" in the defendant's name, taken from him at the time of his arrest, was harmless error. The Court noted that the evidence against the defendant was "overwhelming", as the most damaging evidence against him had already been introduced prior to the introduction of the meal card. As such, reversal of his conviction was not required.
In the case before this court, appellants contend that tardy compliance with the discovery articles in connection with the statistical compilation of the K & B store was *1267 in effect no compliance. Appellants argue that they learned of the existence of the compilation too late to adequately prepare a rebuttal.
In their Motion for Discovery and Inspection filed on May 27, 1981, appellants asked for copies of and access to any documents within the possession, custody, or control of the state which were intended for use by the state as evidence at trial. The state's original answer contains no mention of this statistical compilation. However, on the first day of trial (Wednesday, February 10, 1982), before the voir dire began, the state filed its amended answer to discovery which included information that on Monday, February 8th the state filed three motions for subpoenas duces tecum requesting records of sales of Talwin and pyribenzamine. The prosecutor noted that as of that day (the 10th) no return had yet been made. He further stated:
"But as I've told defense counsel, as soon as they show up with them, of course, they'll be in the record and they'll be available to defense counsel."
The defense attorney made no objection at that time. However, when the compilation was given to him on Friday, February 12th, raised his objections.
Using the test set forth in State v. Ray, the tardy disclosure of this compilation cannot be seen to have so prejudiced the jury as to compel it to reach the wrong conclusion. There is ample testimony of the appellants' guilt above and beyond the the evidence of sales of Talwin in a pharmacy other than the one involved in this case.
It is apparent from the trial transcript that as early as Wednesday, February 10th, appellants knew of the prosecutor's attempts to compile statistical evidence of the sale of Talwin and pyribenzamine. Motions for Subpoena Duces Tecum were in the court file as early as Monday, February 8th. Thus, appellants cannot have been completely "surprised" as to the existence of the compilation when it was given to them on Friday, February 12th.
The state's "late" disclosure of the statistical compilation does not require reversal in this case. Assignment of error twelve is without merit.

Assignment of Error No. XIII
By their assignment of error number thirteen, appellants allege that the trial court erred by allowing the prosecutor to repeatedly ask the defense character witnesses improper questions on cross-examination. Appellants also allege that the trial court's refusal to give an admonition to the jury concerning these remarks was error.
The defense called seventeen character witnesses at trial. Of these, ten were asked what the appellants contend are "improper" questions by the prosecutor. However, in the case of three of these witnesses, appellants did not raise any objection to the prosecutor's questions at the time of trial. Of the remaining seven witnesses who were asked "improper" questions, four were asked if they knew what "T's and blues" were, one was asked if he knew what "sets" were, one was asked if his wife had ever passed prescriptions for "T's and blues", and one was asked if it would surprise him to learn that the Marquers sold forty times as many Talwin tablets in 1980 as the K & B Drug Store located in the same area as the defendants' store. In every case, appellants' objections to these questions were sustained by the trial court, and in only one instance was an answer actually given.
Appellants assign as error, however, the prosecutor's repeated attempts to ask these questions in the face of the sustained objections even though the prosecutor knew that such questions were improper.
Appellants also assign as error the trial court's refusal to grant a mistrial based upon these repeated improper questions. They contend that the judge should have at least admonished the prosecutor to cease asking these questions. However, the transcript shows that the appellants failed to ask for any admonition from the court. C.Cr.P. art. 771 provides for admonition *1268 by the trial court for improper remarks by the prosecutor upon the request of the defendant. As appellants did not make such a request in this case, the judge's refusal to admonish the district attorney cannot be seen as error.
As set forth in La.R.S. 15:479, evidence of character, whether good or bad, may only be set forth through the general reputation of the person among "his neighbors", not upon what a particular person thinks of him. Therefore, appellants assert that the questions posed by the prosecutor were improper.
Even improper questions will not mandate reversal of a defendant's conviction absent a showing of prejudice to the defendant, and the trial court's refusal to grant a mistrial should not be disturbed absent an abuse of this discretion. See State v. Parker, 416 So.2d 545 (La.1982) and State v. Schmidt, 354 So.2d 1339 (La. 1978). Here the trial court sustained every defense objection to the prosecutor's questions, and in all but one instance the witnesses did not answer the questions. The defense attorney did not ask for an admonition concerning the prosecutor's repeated questions, therefore, the trial court's failure to give one was not error. Appellants have not shown that the trial court's refusal to grant the mistrial was an abuse of his discretion. Appellants' assignment of error number thirteen lacks merit.

Assignment of Error No. XIV
Appellants' assignment of error number fourteen pertains to remarks made by the Assistant District Attorney during his rebuttal argument. Appellants contend that the trial court erred in its refusal to declare a mistrial at the close of the state's rebuttal due to these comments.
In their brief, appellants specifically object to three different statements made by the Assistant District Attorney in his rebuttal argument. In the first statement, he remarked:
"He talked about giving immunity to the State's witnesses. Well, I want to know what my priority should be in prosecuting narcotic cases. Should I go after somebody, a pityful (sic) old wreck like Ruby Holmes, and prosecute Ruby Holmes to the fullest extent of the law? Should I go after Robert Melancon, a shoplifter? Or should I go after the big fish, the ones that sell a hundred and sixty-six thousand talwins in eleven months? Which should my priorities be? And ask yourselves what do you want my priorities to be as a citizen"
Appellants argue that by making these remarks the prosecutor wanted the jury to think that "he would not be prosecuting this case unless he had a case", and that he was clearly "appealing to the emotions of the jurors and asking them as citizens to look upon what he as the District Attorney is doing and give him a stamp of approval".
Appellants contend that the prosecutor was really telling the jury that the reason he took this case is because the defendants were guilty, thereby usurping the jury's role at trial.
Appellants also cite as reversible error comments made concerning the testimony of Claude Marquer, Jr.:
"Now, let's talk about some more of the general things that Mr. Dymond brought up in his argument, beginning with Claude Marquer's testimony. Now, Claude Marquer's testimony I think can be summed up in one word and that's unbelievable. He got up on the stand on Saturday and began to recite the story of his life, starting out with a little frame shack on Chef Menteur Highway. I thought we were hearing about Abe Lincoln. And I thought the next thing he was going to tell us is he had to walk eleven miles a day to pharmacy school."
Finally, appellants cite as reversible error the remarks about the defense character witnesses:
"But on the other hand, even Wayne Williams up in Atlanta had character witnesses."
Appellants contend that these remarks were improper attacks on their character and were made only to inflame and prejudice *1269 the jury. They contend that such comments did have an effect on the jury's verdict.
The proper scope of closing arguments is set forth in C.Cr.P. art. 774 which provides:
The arguments shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
Each of the statements to which appellants object were directed in answer to the defense's argument. The sentences preceding the prosecutor's statements refer to statements made by defense counsel during his closing argument. Mr. Chester's remarks about what his priorities should be were apparently addressed to defense counsel's questioning why some of the state's witnesses were given immunity. As for the other remarks, the defense counsel mentioned Mr. Marquer's testimony and that of the character witnesses in his closing argument and Mr. Chester's remarks, made in response, were arguably within the scope of closing argument as set forth in C.Cr.P. art. 774.
Even if the remarks of the district attorney go beyond the scope of closing argument, our Supreme Court has long held that in order to reverse a conviction due to improper argument, the reviewing court must be convinced that the jury was influenced by these remarks and that the remarks contributed to the verdict. State v. Webb, 419 So.2d 436 (La.1982); State v. Sharp, 418 So.2d 1344 (La.1982); State v. Winn, 412 So.2d 1337 (La.1982); State v. Messer, 408 So.2d 1354 (La.1982). In a few cases the court has held that an improper closing remark did not constitute reversible error where there was substantial evidence of the defendant's guilt. State v. Barrow, 410 So.2d 1070 (La.1982); State v. Messer.
In the case before this court, Mr. Chester's statement about appellants' character witnesses, even if found to be improper, appears to be harmless error, and his statements as to Mr. Marquer's testimony, although sarcastic, cannot really be considered to constitute reversible error.
Concerning Mr. Chester's statements about his priorities, such statements were apparently addressed to the defense attorney's questions as to why some of the state's witnesses were granted immunity. In that respect, these statements were within the scope of closing argument. In this case, there is sufficient evidence of appellants' guilt and there is no certainty that any of the remarks complained of contributed to the jury's verdict of guilt. This assignment of error is without merit.
Accordingly, defendants' conviction and sentence are affirmed.
AFFIRMED.