DOUCET, Judge.
The defendant, Scott Allen Thorne, was charged by a grand jury on September 26, 1985, with attempted second-degree murder in violation of La.R.S. 14:27 and La.R.S. 14:30.1. On April 25,1986, a twelve person jury found him guilty as charged. Since the defendant was a multiple offender, on May 16, 1986, the trial court sentenced him to 55 years at hard labor. Defendant now seeks an appeal from his conviction and sentence.
FACTS:
On September 19, 1985, at approximately 4:00 P.M., Theresa Gillespie was driving on the Twin Bridge Road, a two lane road in Rapides Parish. She passed a beige Volkswagen with a bumper sticker on the trunk reading, “DON’T LAUGH, IT’S PAID FOR.” A few minutes later she noticed that the car was on the next lane and that the driver, whom she did not know, was indicating that she had problems with her tire. Since she had had trouble with her tire in the past, she pulled her car over to the side of the road. The driver of the other car also exited his car and approached Gillespie. As she was bending down to examine the tire and realized nothing was wrong, the man, who had been standing behind her, displayed a steak knife with a serrated edge. Although she volunteered to give him money or her car, he stated that he wanted her to go with him and would “cut” her throat if she screamed. As she tried to run from him, he grabbed her by her hair and dragged her towards his car. He then opened the door on the driver’s side and placed her on the driver’s seat with her feet hanging out of the car. When she started kicking him, *763 he attempted to stab her in the chest but because she moved, he stabbed her in the side. She continued to kick him and caused him to fall back and drop the knife on the road. She was then able to get out of the car and run down the road before tripping. As the assailant got into his car and drove away, she noticed part of the license plate number. The victim then got into her car and drove to a nearby store where an ambulance was summoned to transport her to a hospital.
The medical reports indicate the victim suffered a stab wound to the left lower lateral posterior chest. It appears that she received a life threatening wound, for she lost a large amount of blood and received blood transfusions.
Approximately an hour after the incident, Deputy Laughlin visited the victim in the hospital. She described the assailant as a white male in his mid-20’s, weighing 140 pounds, measuring 5*7” to 5’9”, and having light blond hair. She described the car as a light beige Volkswagen with damage to the left rear bumper, with a license plate partially reading “25 E” and with a bumper sticker on the trunk stating, “DON’T LAUGH, IT’S PAID FOR.”
A bulletin describing the car and the assailant was broadcast by the sheriff’s radio operator. On September 23rd, a report was made that the described car had been seen at Finley’s Restaurant approximately 15 miles from the scene of the crime. Officers Laughlin, Elias and Fairbanks proceeded to the restaurant and found the car whose characteristics matched those of the car described by the victim. The car at the restaurant was a light yellow Volkswagen with the license plate number 255E693, and with a bumper sticker on the trunk reading “DON’T LAUGH, IT’S PAID FOR.” Laughlin testified that the car had been recently painted in several spots. A registration check of the car indicated that it belonged to Scott Allen Thome, the defendant. The deputies entered the restaurant, asked for the defendant and placed him under arrest.
On September 25, 1985, Deputy Laughlin again visited the victim at the hospital and showed her five photographs, one of which was of the defendant. She chose the photograph of the defendant as the photograph of her assailant. At trial, the victim again identified the defendant as her assailant.
At trial, Pat Wojtkiewioz, a forensic scientist who analyzed the blood from the victim and the defendant, and blood found in the defendant’s car, testified that the blood in the car was in the same group as the victim’s blood. He further stated that out of a group of 100,000 people, 499 people other than the victim could have left the blood.
Susan Garr, the manager at Finley’s, testified that on the afternoon of the incident, the defendant left the restaurant at 4:00 P.M. and returned at approximately 4:30 P.M. According to Garr, he was perspiring, had no shirt, and claimed that he had problems with his car and had to push it. Harold Schumacker, who worked on the defendant’s car, testified that the car would not travel at 65 mph. The defendant also presented as a witness, J.P. Hickman, a mathematics teacher who testified that to travel from Finley’s to the scene of the crime and back after a ten minute delay, the car would have to travel at 70 mph. for 35 minutes.
ASSIGNMENT OF ERROR NO. 1 IN BRIEF AND IN ASSIGNMENTS OF ERROR FILED IN TRIAL COURT:
In this assignment of error, the defendant claims that the trial judge erred in assuming a prosecutorial function and commenting upon the evidence. The defendant complains of the exchange between the trial court and the state’s expert witness, Pat Wojtkiewioz, which incurred after cross-examination as follows:
“BY THE COURT:
Q. While it’s on my mind, Mr. Wo-jtkiewioz, Mr. Everett brought up the point that assuming for purposes of discussion that there were a hundred thousand people in Rapides Parish. Therefore, under your averaging here, it could have been five hundred people?
A. That’s correct.
*764 Q. Four hundred and ninety-nine other than Ms. Gillespie could have left the blood, right?
A. Again you’d have to say that .5 percent is basically on a Caucasian population. There would be nowhere near five blacks in a thousand that would have that blood type.
Q. All right, but if you reduced it, say, two to one down ...
A. It’d be more than that. It would ... you would be talking more in the neighborhood of one out of ten thousand blacks or maybe less than that would have that blood type.
Q. I see, but then even breaking it down there, you’d say that it could be conceivably several hundred possibilities, but does that mean that you’d have to have the whole hundred thousand people exposed to depositing that blood, is that correct?
A. That is correct. They’d have to be able to deposit that blood in that car to be part of the population that could have left it there.
Q. So, in other words, if you assume it’s possible that five hundred people, four hundred and forty-nine other than Teresa Gillespie could have left the blood that’s assuming that the whole hundred thousand people would have had to have ridden in that vehicle within the last month?
A. Or been exposed to it in some way. BY MR. EVERETT:
Your Honor ... Your Honor, I ... I do not want to be put in the position of objecting to the court but I do want to register an objection to the court examining the witnéss as a prosecutor.
BY THE COURT:
The court has authority to cross-examine expert witnesses.
BY MR. EVERETT:
I know that the court has the authority to ... to question the expert witness ... BY THE COURT:
In criminal cases.
BY MR. EVERETT:
... in criminal cases and indeed in any case, but I am going to register an objection to the court assuming any prosecuto-rial function.”
Defendant argues that the above examination by the trial judge violated La.C.Cr.P. article 772, which provides as follows:
“The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.”
The defendant claims the trial judge assumed the role of prosecutor, destroyed the cross-examination by the defense and persuaded the jury that the blood in the car came from the victim.
La.C.Cr.P. art. 772 does not prohibit the trial judge from clarifying testimony. State v. Roberson, 445 So.2d 12 (La.App. 4th Cir.1983), writ denied 449 So.2d 1344 (La.1984); State v. Williams, 375 So.2d 1379 (La.1979). In the case at hand, it appears that the trial judge was only attempting to explain some testimony. The questions by the trial judge pertained to information elicited during cross-examination. The defense cross-examined the witness as follows:
“DEFENSE COUNSEL:
[[Image here]]
Q. Okay, so to sum up then, you did all these tests and came out with ... with these results but the tests don’t prove that Teresa Gillespie’s blood is in Scott Thorne’s car, does it?
A. They only ... the blood stain there could have come from Teresa Gillespie but it’s not absolute certain that it came from Teresa Gillespie.
Q. Okay. It doesn’t prove it is her blood to the exclusion of all others?
A. It merely shows that it could be her blood.
Q. And another thing, the ... if there are 100,000 people in Rapides Parish, on your percentage 500 of them have these groupings, isn’t that correct?
A. 100,000. About ... you said about 500?
*765 Q. Uh-hum, assuming an average.
A. Well, you ... you could virtually eliminate almost all the blacks. The Adenosine Deaminase, that 2-1, very, very few blacks have that blood type, so you’d have to eliminate the ... the ... virtually eliminate the black population from that.
Q. All right, now ... now, let me get ... let meet this. Let me see if I understand this. Is this 5,000ths of the general population or of the white population?
A. The Caucasian population.
Q. Caucasian population?
A. Yes.
Q. Now, then if the ... if the Caucasian population is let’s say 50,000, then we would be looking at 250 of those who have that particular blood, isn’t that correct?
A. Approximately, yes.
Q. Okay, and that’s ... that’s just assuming an average. It may be more than 250 and it may be less, isn’t that right?
A. It would probably fall within there. It could be as many as 260, 270, maybe as few as 200. That’s ... just in that general area.
Q. Well, you ... you haven’t done any samplings to find out how many in Rapides Parish have this, do you?
A. Well, I’ve done fairly extensive blood typing in North Louisiana. Part of these numbers here, I drew those from over almost 2,500 blood typings that I’ve done in the North Louisiana area which would include some from Rap-ides Parish.
Q. Oh, excuse me, wait just a minute. Are these ... is this your ... your figure that you came up with?
A. Oh, yes.” (Emphasis Added).
As the record reveals, during both the defense’s cross-examination and the judge’s inquiry, the witness was questioned about the percentage of the population that may have left the blood found in the car. The trial judge, however, was not improperly reiterating the witness’ testimony but was attempting to bring forth additional information. As a result of the trial court’s questioning, the additional information that one out of 10,000 blacks and that 499 people other than the victim may have deposited the blood was elicited.
In State v. Roberson, supra, in finding that the trial judge’s questions did not constitute an impermissible comment on the evidence, the Fourth Circuit noted that no prejudice resulted to the defendant, for the witness did not alter her previous answer in response to the court’s question. As in State v. Roberson, supra, in the case at hand the witness’ responses to the trial judge’s questions did not contradict his testimony. It, therefore, appears that the trial judge did not comment on the evidence, act as a prosecutor, and did not cause prejudice to the defendant.
The defendant further argues that the trial court improperly commented upon the facts in referring to the defendant as the assailant. The colloquy in question proceeded as follows:
“REDIRECT EXAMINATION BY MR. FOWLER:
Q. Ms. Gillespie, if you told ... if the medical records from the Emergency Room indicated that you told the physician that you’d been stabbed approximately 4:10 p.m., would that be accurate?
A. Yes.
Q. Okay, and it’d be what you told us today?
A. Yes.
Q. Okay. Now, Mr. Everett has gone into this event and used the term for the defendant on trial as “this individual” and “this attacker” and “this assailant” and all these other pronouns and nouns and adjectives describing the individual. I’d like for you to tell the jury just exactly who the individual was and is that stabbed you?
BY MR. EVERETT:
Your Honor, that is improper ... that is improper redirect. It has no probative value of any information listed on cross-examination. It is merely repetitive of the ... the things that have gone before.
*766 The jury has heard this and I really don’t think there’s any ... any useful purpose to be served by her further answering that question. It adds nothing.
BY MR. FOWLER:
In rebuttal to an area that was brought up numerous times in which Ms. Gillespie attempted to correct him by saying “Scott did,” he said, “No, I (Indistinct) the assailant, the individual.” He went back and back and never did use the defendant or have him identified so I’m now rebutting that which he has tried to say that someone else did it. I ... I can use that as to the assailant, the attacker, this person and ... and I wrote down and I just quit after five. I didn’t think there was anything else, you know, and she tried to correct him on the thing but he ...
BY THE COURT:
Well, he ... he didn’t ... far as I can recall and Mr. Everett takes the position, I assume, that his client didn ⅞ do it and he used the phrase “assailant, ” “attacker. ” I ... I really saw nothing wrong with ... with that phraselogy (sic) at that point. The objection is sustained.
BY MR. FOWLER:
All right, sir. I don’t think I have anything that ...
BY THE COURT:
And I believe I’m correct, am I not, counsel for both sides that Ms. Gillespie has identified the accused, Mr. Scott Thorne, as her assailant, has she not?
BY MR. EVERETT:
Your Honor, she’s ... she’s made a ... a legally founded in-court identification.
BY THE COURT:
That’s what I say. She has testified that she recognized him.
BY MR. FOWLER:
Yes, sir.
BY MR. EVERETT:
And ... and we did not object to her in-court identification.
BY THE COURT:
Yes, I understand. All right.
BY MR. FOWLER:
I ... I don’t let me see. I don’t think I have anything else to even ...
BY THE COURT:
All right, you may confer.
BY MR. FOWLER:
All right, just one second.” (Emphasis Added).
It should be initially noted that the defendant did not object to the court’s comment and, thus, may have waived his right to complain on appeal. La.C.Cr.P. art. 841. Even if the defendant had objected, pursuant to State v. Pettaway, 450 So.2d 1345 (La.App. 2nd Cir.1984), and State v. Guin, 444 So.2d 625 (La.App. 3rd Cir.1983), the trial judge was properly ruling on an objection and, thus, was not making prejudicial remarks when he stated as follows:
“Well, he ... he didn’t ... far as I can recall and Mr. Everett takes the position, I assume, that his client didn’t do it and he used the phrase “assailant,” “attacker.” I ... I really saw nothing wrong with ... with that phraselogy (sic) at that point. The objection is sustained.”
In stating that the victim had identified the defendant as the assailant, the trial judge was clarifying the discussion between the attorneys and was not commenting on the evidence. State v. Roberson, supra.
The record indicates that the trial judge did not improperly comment in the evidence. This assignment of error, thus, lacks merit.
ASSIGNMENTS OF ERROR NOS. 2, 3, 4, 5, AND 6 IN BRIEF ASSIGNMENT OF ERROR NO. 3 OF ASSIGNMENTS OF ERROR FILED IN TRIAL COURT:
In this assignment of error, the defendant contends that the trial court erred in not permitting the defense to cross-examine a prosecution witness. On rebuttal, the state presented Deputy Elias. After the court sustained the defendant’s objection to some of his testimony, the state began its closing argument. The defendant now claims he was denied the right to cross-examine the witness. The defendant however, did not object to the state’s proceeding with a closing argument after the witness was excused. Pursuant to La.C. Cr.P. art. 841, the defendant cannot com *767 plain of an error on appeal if he did not object at the time of its occurrence. This assignment of error, thus, lacks merit.
In his brief under these assignments of error, the defendant argues that the trial court erred in permitting the state to engage in improper rebuttal; however, that argument was not included in any of the assignments of error filed in the trial court. An assignment of error appearing for the first time in a brief cannot be considered on appeal unless the matter falls into the category of an “error patent.” State v. Spears, 350 So.2d 603 (La.1977); State v. Spell, 399 So.2d 551 (La.1981); State v. Sonnier, 441 So.2d 359 (La.App. 5th Cir.1983); State v. Bridges, 444 So.2d 721 (La.App. 5th Cir.1984). Since the claim of improper rebuttal is not an error patent, absent a corresponding assignment of error filed in the trial court, it cannot be addressed on appeal.
ASSIGNMENTS OF ERROR NOS. 7 AND 14 IN BRIEF. ASSIGNMENTS OF ERROR NOS. 2 AND 9 OF ASSIGNMENTS OF ERRORS FILED IN TRIAL COURT:
In this assignment of error, the defendant claims that the trial court erred in denying his motion for a new trial in that the defendant was denied substantive due process by the state’s withholding exculpatory evidence concerning the testimony of a prosecution expert witness. The defendant argues that the state violated discovery articles by not providing the defendant with the study on which Pat Wojtkiewioz based his findings.
The record indicates that during the cross-examination of Pat Wojtkiewioz dialogue ensued as follows:
“DEFENSE COUNSEL:
Q. All right, now ... now, let me get ... let me get this. Let me see if I understand this. Is this 5,000ths of the general population or of the white population?
A. The Caucasian population.
Q. Caucasion population?
A. Yes.
Q. Now, then if the ... if the Caucasian population is let’s say 50,000, then we would be looking at 250 of those who have that particular blood, isn’t that correct?
A. Approximately, yes.
Q. Okay, and that’s ... that’s just assuming an average. It may be more than 250 and it may be less, isn’t that right?
A. It would probably fall within there. It could be as many as 260, 270, maybe as few as 200. That’s ... just in that general area.
Q. Well, you ... you haven’t done any samplings to fjpd out how many in Rapides Parish have this, do you?
A. Well, I’ve done fairly extensive blood typing in North Louisiana. Part of these numbers here, I drew those from over almost 2,500 blood typings that I’ve done in the North Louisiana area which would include some from Rap-ides Parish.
Q. Oh, excuse me, wait just a minute. Are those ... is this your ... your figure that you came up with?
A. Oh, yes.
Q. You didn’t get this from some book somewhere?
A. No.
Q. This is from your own experience?
A. Yes.
Q. Of the ones that you have gone ... of the ... of the ones that you have ... have personally analyzed, is that correct?
A. The ones that have been typed in our laboratory.
Q. In other words, there’s no national book or anything like that that you’re taking that figure from, that’s just ... that’s from what you have done in the 180 cases you’ve testified in in court, isn’t that right?
A. I have testified in a 180 cases but I have worked several thousand cases in the nine years that I’ve been with the Crime Laboratory.
Q. Well, let me get into that for a minute because I think your sampling is *768 important. When did you do this study on this?
A. These ... these numbers were taken from blood types I’ve typed since 1981 on.
Q. Well, did you use all the blood typ-ings?
A. Yes.
Q. How many was that?
A. There’s approximately 22 to 2,500 bloods in that sample.
Q. So, 22 to 2,500 blood ... blood samples, you found this percentage, is that right?” (Emphasis Added).
The above indicates that the numbers on which the witness based his calculations of the percentage of the population having the blood found in the car were derived from his own study. A comparison chart of the percentages was thus, also based on his own study. The defendant did not object to the introduction of the exhibit, or of the witness’ testimony. It could thus be argued that pursuant to La.C.Cr.P. art. 841, the defendant waived his right to complain of that error.
The defendant nevertheless argues that in response to his motion to produce exculpatory evidence, the state should have informed him that the statistical data regarding blood typing about which the expert testified was based upon the expert’s personal studies of 2,200 cases. The defendant claims that if he had been aware of the nature of the study, he would have retained his own expert forensic serologist.
La.C.Cr.P. arts. 718 and 719 provide as follows:
“Art. 718.
Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
(2) are intended for use by the state as evidence at the trial, or
(3) were obtained from or belong to the defendant.
The court may determine whether evidence is subject to the provisions of Paragraph (1) hereof by in camera inspection.
Art. 719.
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial.”
It appears that in response to the defendant’s motion for discovery and inspection, on December 31, 1985, the state provided the defendant with a copy of the results of the blood analysis performed by Pat Wo-jtkiewioz. A copy of the expert’s study however, was not provided to the defendant.
The failure by the state to disclose will not automatically require reversal of a conviction. The defendant must show that he was prejudiced by the failure to disclose. State v. Arnaud, 412 So.2d 1013 (La.1982); State v. Marquer, 446 So.2d 1258 (La.App. 4th Cir.1984). In the case at hand, it appears that in light of the conclusive evidence supporting the conviction, the information on which the expert’s percentages were based may be considered insignificant and not prejudicial. Furthermore, as the trial judge noted in denying the defendant’s motion for a new trial, the fact that the expert’s percentages were calculated from his own studies affects the weight of his testimony more than its admissibility. This claim, thus, lacks merit.
*769 In his brief under these assignments of error, the defendant further contends that the trial court erred in denying his request for production of all prior statements by the victim. This claim however, was not mentioned in any of the assignments of error filed in the trial court, cannot be considered an errors patent, and therefore, cannot be addressed on appeal. State v. Spears, supra; State v. Spell, supra; State v. Sonnier, supra; State v. Bridges, supra.
ASSIGNMENT OF ERROR NO. 8 IN BRIEF:
In this assignment of error, the defendant argues that he was denied the right to a fair trial due to improper personal remarks made by the prosecutor. This claim however, was not included in any of the assignments of error filed in the trial court. As mentioned previously, since the contention was not contained in the assignments of error filed in the trial court and was not an errors patent, it cannot be addressed on appeal. State v. Spears, supra; State v. Spell, supra; State v. Sonnier, supra; State v. Bridges, supra.
ASSIGNMENTS OF ERROR NOS. 9 AND 10 IN BRIEF.
ASSIGNMENTS OF ERROR NOS. 5 AND 9 FILED IN TRIAL COURT:
In this assignment of error the defendant alleges that the trial court erred in denying a motion for mistrial on the grounds that the defendant was denied a fair and impartial trial as a result of prejudicial remarks by the prosecutor in closing arguments. The defendant argues that the state improperly referred to other crimes committed by the defendant and made other prejudicial remarks.
La.C.Cr.P. art. 770 provides as follows:
“Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.”
La.C.Cr.P. article 774 provides as follows:
“The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state’s rebuttal shall be confined to answering the argument of the defendant.”
The remarks made during closing argument which the defendant contends violated La.C.Cr.P. art. 770 and referred to other crimes include the following:
[[Image here]]
“Mr. Giese tells you a little bit about his background. Mr. Giese tells you he’s not a boy. He’s not a young man. He’s someone who has been down the road. He knows all about these things. You heard that evidence. “I don’t want to have anything to do with that.” (Indistinct) Mr. Giese tells you those things. * * * * * *
... If you want to believe him, one who’s been down the road with a background like his, ...
[[Image here]]
Now, the defendant was not a boy that was scared. Yes, he was a ... he’s a man. He’s a twenty-five year old man. He’s a twenty-five year old man with a background where he knows the ropes. He knows what’s going on and at that point is trying to make an alibi for him *770 self but alibi is going to stink because the people aren’t going to alibi for him and say that he stayed there the whole time. ...
[[Image here]]
Don’t think, please, my goodness, I’ll get on my hands and knees and beg you, don’t think or try to think in a criminal mind or a criminal way. Jurors, and please remember this when you go back there and take a minute, jurors say rationally things like, “Why did he do this?” You know, goodness knows why he picked this part of the road or this part of the highway or why he picked Ms. Gillespie. You’re applying your rational, honest, legal conscience to the actions of a criminal who is not honest ...”
Giese’s description of the defendant’s background to which the state referred in the above statements appears to have been a comment made by Giese, the defendant’s co-worker, at a hearing for a motion for bond reduction. Giese testified that the defendant did not attempt to conceal his spending time at Angola. The transcript of that testimony was introduced by the defendant.
In referring to Giese’s account of that background, the state was commenting on admissible evidence, Giese’s testimony. La.C.Cr.P. art. 774. If the defendant had not desired the state to allude to such comments, he should not have admitted into evidence the transcript of that testimony.
The other statements which the defendant alleges were prejudicial include the following:
“... Don’t plea bargain. Please don’t plea bargain a case of this magnitude because I’m going to tell you why, the facts dictate the verdict because you’re going to look at ... I’m going to take the bottom one first, not guilty. The evidence is overwhelming that he’s guilty of the crime.
[[Image here]]
... I was sitting there like you and I'm tired and I’d eaten a little bit and the blood sugar gets a little bit better and you start kind of mellowing out and then he started getting in an area which really ticks me off which is a normal thing. When a defense attorney doesn’t have a good case they start attacking the witnesses ...”
After the defendant’s objections to those comments, the trial court admonished the state to “keep his remarks as low key as possible” but did not grant the defendant’s motion for a mistrial. A verdict will not be overturned on the basis of improper argument unless the court is convinced that the jury was influenced by the remarks which thus contributed to the verdict. La.C.Cr.P. art. 921. The trial court’s determination that a new trial is not mandated by the effect those remarks will not be disturbed absent an abuse of discretion. State v. Douglas, 389 So.2d 1263 (La.1980). In the case at hand, the record does not indicate that the trial judge abused his discretion in finding that the prosecutor’s remarks did not influence the verdict and thus necessitate a new trial. This assignment of error therefore, lacks merit.
ASSIGNMENTS OF ERROR NOS. 13 AND 15 IN BRIEF:
In these assignments of error, the defendant contends that the trial court erred in allowing Deputy Billy Laughlin to testify over objection to alleged hearsay statements made by defendant, and that the trial court erred in imposing an excessive sentence. These assignments of error were not filed in the trial court, do not address an errors patent issue and thus, cannot be considered on appeal. State v. Spears, supra; State v. Spell, supra; State v. Sonnier, supra; State v. Bridges, supra.
ASSIGNMENTS OF ERROR NOS. 11 AND 12 IN BRIEF.
ASSIGNMENTS OF ERROR NOS. 6, 7, AND 8 FILED IN TRIAL COURT:
In these assignments of error the defendant alleges that the trial court erred in denying the defendant’s motion for a new trial and the defendant’s motion to modify the verdict, for the verdict was con *771 trary to the law and evidence. The defendant argues that the jury failed to resolve any reasonable doubt created by the evidence in the defendant’s favor. He further claims the state did not prove specific intent.
Attempted second-degree murder is defined as follows:
“La.R.S. 14:27:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
[[Image here]]
La.R.S. 14:30.1:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.”
The defendant argues that the jury should have believed his alibi. The defendant presented a witness, Garr, who testified that the defendant left the restaurant at 4:00 p.m. and returned at 4:30 p.m. The defendant also introduced testimony that his car could not travel over 50 mph and that for him to travel from the restaurant to the scene of the crime and back in 35 minutes, the car would have had to travel at 70 mph. He argues that as the basis of that testimony, the jurors should have concluded that the defendant could not have committed the crime within the time frame described by Garr. The jury however, apparently did not find Garr’s testimony credible. The determination of the credibility of the witness will not be disturbed unless clearly contrary to the evidence. State v. Klar, 400 So.2d 610 (La.1981). The jury’s not believing Garr is not contrary to the evidence.
The defendant further argues that the state did not show the defendant had specific intent. The standard of review in cases involving challenges to the sufficiency of the evidence is whether, viewing the facts in the light most favorable to the state, a rational trier of fact would have found beyond a reasonable doubt that the element was proved. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The state’s evidence that the defendant stabbed the victim in the chest and told her that he would cut her throat if she screamed would have convinced a rational trier of fact beyond a reasonable doubt that the defendant had the specific intent to inflict great bodily harm or kill.
The defendant also claims that the evidence, in general, did not support the conviction. The evidence that the victim identified the defendant twice as her assailant, that his car matched the description of her assailant’s car, that the blood in his car was of the same group as the victim’s, and that his workplace was in the area of the scene of the crime would indicate that the *772 defendant was in fact the assailant. Viewing that evidence in the light most favorable to the prosecution, a rational trier of fact would have found beyond a reasonable doubt that the defendant was guilty. These assignments of error lack merit.
ASSIGNMENTS OF ERROR NOS. 4 AND 10 FILED IN THE TRIAL COURT:
These assignments of error were not briefed and thus, are considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982).
Accordingly, for the reasons stated above, we affirm the judgment of the trial court at appellant’s cost.
AFFIRMED.