LANIER, Judge.
The defendant, Daniel Ray Dixon, was charged by grand jury indictment with aggravated rape in violation of La.R.S. 14:42 and attempted second degree murder in violation of La.R.S. 14:27 and 30.1. He pled not guilty to both charges and, after a trial by jury, was found guilty of attempted aggravated rape and attempted second degree murder. He was sentenced to serve fifty years at hard labor in the custody of the Louisiana Department of Corrections on each charge. The district court judge ordered that these sentences run concurrently with each other and concurrently with any other sentence that Dixon was then serving. He was also ordered to pay $1,088.75 in costs. This appeal followed.
FACTS
The victim, a sixty year old woman, received a phone call at her home at approximately 12:30 a.m. on August 30,1982. The caller identified himself as Ray and said that he had some shrimp he wanted to bring to her. The victim had talked with Ray on three previous occasions, and he had promised to get her some shrimp. A short time later, the victim heard a knock at her door. She went to the door and asked, “Who is it?” The person outside answered “Ray”. She unlocked the door, opened it and looked out through the screen door. She then unhooked the screen door and let the man inside. She asked him, “Where are the shrimp?” He replied that he had left them in the car. She told him to go and get the shrimp and she would get some money to pay him. As she turned, he leaped across the room and placed a knife at her throat. He forced her into the bedroom where he undressed himself and the victim. According to the victim, she was then raped. The assailant next forced her into the bathroom where he attempted to drown her. He then took her back into the bedroom where he slashed her breasts and stabbed her numerous times. The stab wounds required surgical repair of her left lung and liver and the removal of her gallbladder. The assailant then disconnected the phone, washed his hands, dressed and left. After the assailant left, the victim reconnected the phone and called an operator for assistance. The police arrived shortly thereafter, and the victim was transported to Earl K. Long Hospital for medical treatment. At 5:00 a.m. on August 30, the victim gave the police a taped statement. She identified her assailant as a man named Ray whom she had seen on three previous occasions. In addition, she told the police that he lived on Cedar Street (one block over where she lived) with his mother and that he worked for Georgia-Pacific.
Prior to 1:00 p.m. on August 30, 1982, Officer Robert N. Howie of the Major Crime Investigation Division of the Baton Rouge Police Department prepared a “working” lineup of 25 or 30 “mug shot” photographs and a photograph of Dixon secured from the State Driver’s License Office. This “working” lineup was to be used to see if the victim could identify her attacker. The “mug shot” photographs showed the height of the individual in the background and had Baton P.D. and a number under the picture. These photographs measured two and one-half inches wide and three and one-half inches high. The photo of Dixon’s driver’s license measured three and one-half inches high and five inches wide. The individual’s picture on the photograph of the driver’s license measures one and one-half inches wide and two inches high. (Apparently only the picture portion of the photograph of Dixon’s driver’s license was shown to the victim.) After Officer Howie prepared the “working” lineup, he gave it to Detective Charles Mon-drick of the Sex Crimes Unit of the Baton Rouge Police Department.
At approximately 1:00 p.m. on August 30, 1982, Mondrick went to the Earl K. Long Hospital to see the victim. Mondrick learned from the medical staff that the victim had gone through surgery but was capable of seeing him. Mondrick went to the victim’s hospital room and asked her if she knew who had attacked her. The victim responded that the attacker’s name *857 was Ray and he lived on Cedar Street with his mother. Mondrick left the room and returned shortly thereafter with the “working” lineup. Dixon’s picture was placed third in the group. The victim started going through the photographs, and when she reached the photograph of Dixon, she identified him as the person who had attacked her.
Prior to 5:30 p.m. on August 31, 1982, Mondrick prepared a “regular” photographic lineup. This lineup was comprised of six head-and-shoulder, cut out photographs which were pasted to the inside of a manila file folder. The photographs were numbered one through six and number five was assigned to Dixon. At approximately 5:30 p.m. on August 31, 1982, Mondrick returned to Earl K. Long Hospital and showed the “regular” photographic lineup to the victim. The victim identified photograph number 5 (Dixon’s) as that of her attacker and signed her name under the photograph. Thereafter, Mondrick secured an arrest warrant for Dixon. The “regular” photographic lineup was introduced in evidence as Exhibit S-13 at the trial.
Prior to trial, Dixon filed a discovery motion which contained the following two interrogatories:
7.
Please list any papers, documents, photographs or any other tangible objects the State intends to use upon trial of this matter, either belonging to the defendant or any other witness.

12.
Please provide for inspection the photographs used in the alleged identification of defendant and the manner in which the photograph was presented to the victim whether individually or in a photographic line up.
In response to these interrogatories, the State filed the following answers:
7.
Photographs of the crime scene, photo lineup, photographs of defendant’s vehicle, clothing and bedding belonging to the victim.

12.
Photo lineup will be made available for inspection by the defendant at a time convenient to counsel for both the State and the defendant.
The State’s replies to the pertinent discovery interrogatories do not mention the “working” lineup. In his testimony at the trial, Detective Mondrick explained what happened to the “working” lineup as follows:
Q. Okay, and does the actual working lineup that you used on August 30, 1982, exist today?
A. I have no knowledge of that. I— when I got through with it, I returned it to Detective Howie’s desk in the manner that he gave it to me, and apparently he’s used it since then or someone else has. I don’t know.
Q. It would be fair to say that that actual working — the exact working lineup that was used on August 30th does not exist today.
A. Yes, Sir.
During the testimony of the victim at the trial, the State attempted to question her about the “working” lineup. Counsel for Dixon objected asserting that the testimony was inadmissible because it was “part of the investigation of a crime”, “not part of the elements of the crime” and “what happens to this lady later on that has nothing to do with the defendant in this case”. The State responded that the identity of the defendant was an issue in every criminal case, and the court overruled the objection. The victim then proceeded to describe the procedure used for the “working” lineup. Subsequently, the victim was shown State Exhibit 13 (the “regular” lineup). Counsel for Dixon objected to this testimony contending it was inadmissible because “it will unduly prejudice the jury against my client”, “it’s not necessary in proving the elements of this crime” and *858 “unless an explanation is given as to how the police have in their possession a photograph of this defendant, he’s going to have to get on the witness stand and testify and explain that.” Dixon’s counsel also contended that the “regular” lineup was not necessary to prove the elements of the crime because the victim had already made an in-court identification of Dixon. The district court judge overruled the objection. Counsel for Dixon then made a motion for a mistrial based on the arguments previously made, and this motion was also denied. The victim then proceeded to describe the procedure followed in her identification of Dixon in the “regular” lineup.
During his testimony at the trial, Detective Mondrick was allowed to describe the procedure used in the “working” lineup without objection. However, when Mon-drick was testifying about the procedure used in the “regular” lineup, counsel for Dixon had the jury retired and made a motion for a mistrial. In addition to the arguments previously advanced, Dixon asserted that he had filed a motion for discovery and that at no time was he advised of the “working” lineup. Counsel further contended that the evidence of the “working” lineup came as a surprise and left him in a position where he could not “evaluate, rebut or in any way cross-examine concerning that particular photograph.” The State responded that, as far as the discovery motion was concerned, it gave the defendant everything it had. The court denied the motion for mistrial. Counsel for Dixon then requested an instanter subpoena for the “working” lineup. This request was granted and Officer Howie was ordered to produce that evidence in court. Apparently, Howie produced a group of photographs in court, but they were not introduced in evidence. Detective Mondrick was recalled and gave the explanation about the existence of the “working” lineup quoted here-inabove.
VALIDITY OF IN-COURT IDENTIFICATION
(Assignment of Error 2)
Dixon contends that the “working” lineup was impermissibly suggestive because of the difference in size of his photograph as compared to the other photographs shown to the victim, citing State v. Wil-lialns, 341 So.2d 370 (La.1976). From this basic premise, Dixon argues that the in-court identification made by the victim was prejudicially tainted by 'the initial “working” lineup and therefore was inadmissible.
Even if we assume that the “working” lineup was a tainted pretrial identification, this does not render the in-court identification inadmissible if the in-court identification is reliable and has an independent basis. It is the likelihood of misidentification which violates due process, not merely a suggestive identification procedure. The following five factors are used to determine when an identification is . reliable and independent of a primary taint: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Davis, 385 So.2d 193 (La.1980); State v. Lucky, 453 So.2d 1234 (La.App. 1st Cir.1984); State v. Marx, 446 So.2d 1313 (La.App. 2nd Cir.1984).
The opportunity to view. The offenses occurred after midnight in the victim’s apartment. The lights were on in the apartment, and the victim was in direct confrontation with the offender during the entire course of the offenses. The victim met the offender at the door, recognized him and allowed him into the apartment. The victim had an excellent opportunity to observe the offender.
The degree of attention. The victim’s attention was obviously rivetted to the offender. He promised to bring her some shrimp, she recognized him before she allowed him into her apartment and she was closely and directly confronted by him during the course of the attack.
*859 The accuracy of the description. The victim described the offender as a black male, dark complected, approximately five feet ten inches to six feet in height, with a medium Afro and a muscular build. She also told the officers he was wearing a red T-shirt with writing on the front. She further identified her attacker as a person named Ray who lived with his mother on Cedar Street which was one street over from the victim’s apartment. She further advised that Ray worked for Georgia-Pacific.
The level of certainty. The victim positively identified Ray Dixon as the person who attacked her.
The time between the crime and the confrontation. The offense occurred shortly after midnight on August 30, 1982. The victim identified Dixon in the “working” lineup shortly after 1:00 p.m. on August 30, 1982. The victim also identified Dixon in the “regular” lineup shortly after 5:00 p.m. on August 31, 1982. The trial of this matter was held on June 20-21, 1983.
The certainty of the victim’s identification of Dixon is bolstered by the fact that she had met him on three occasions prior to the offense. She met him for the first time during June of 1982 when he gave her a ride to the Southern University campus. On that occasion, Dixon told the victim that his name was Ray, that he worked at Georgia-Pacific and he lived with his mother on Cedar Street. Dixon told the victim he had some friends who shrimped, and the victim said she liked shrimp. Dixon told her he would get her some shrimp. The victim saw Dixon again on July 19, 1982, when she was waiting for a bus at the corner of Scenic Drive and Choctaw. Dixon drove up and gave her a ride to the Food Stamp office. She then went with him to two auto repair places and thereafter got a sandwich and a cold drink at a restaurant. Dixon then took her to the Unemployment Compensation office. The victim gave Dixon her phone number to call her if he got some shrimp. Dixon called her at home later that afternoon to make sure that the phone number was correct. Two or three weeks later, Dixon called the victim to tell her a woman had been hired at the Georgia-Pacific plant. The victim was interested in possibly applying for a job there. Dixon asked the victim if he could come to her home and tell her about the work. She gave him directions to her home and he came over and they discussed the work at Georgia-Pacific.
Weighing the above factors, we find that the victim’s in-court identification was reliable and independent from the “working” lineup identification. There is no substantial likelihood that the victim misidentified Dixon.
This claim of error is without merit.
FAILURE TO COMPLY WITH DISCOVERY
(Assignment of Error 2)
Dixon contends that the failure of the State to advise him of the “working” lineup identification by the victim in its answers to the discovery interrogatories was a discovery failure entitling him to the sanction of mistrial as authorized by La.C.Cr.P. art. 729.5. In particular, Dixon contends that the discovery failure affected his right to cross-examine in that “he was in no position to evaluate, rebut, or in any way cross-examine that evidence.” Dixon also contends that “... the nondisclosed evidence would have created a reasonable doubt which did not otherwise exist if he would have had access to that evidence prior to the trial.”
Pursuant to La.C.Cr.P. art. 718, a defendant in a criminal case is entitled to discovery of books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which are favorable to the defendant and are material and relevant to the issue of guilt or which are intended for use by the state as evidence at the trial. The State has a continuing duty to make discovery disclosures if it discovers additional evidence or decides to use additional evidence. La.C.Cr.P. art. 729.3. *860 If the State fails to comply with a discovery order or motion, the court as a sanction may permit the discovery, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing the evidence not disclosed, or enter such other order (other than dismissal) as may be appropriate. La.C.Cr.P. art. 729.5.
At the trial, the State advised the court that it did not advise the defendant of the “working” lineup because it was not aware of its existence. The defendant did not challenge this statement at the trial or in brief before this court. Detective Mon-drick testified that it was impossible to reproduce the exact “working” lineup because the photographs of persons other than the defendant apparently had been changed between August 30, 1982, and the date of trial. The State did produce photographs which were similar to those used in the “working” lineup, and these were filed into evidence by the defendant. If it is the defendant’s contention that this evidence is favorable to his case, he was given an opportunity to present, and did present, this evidence to the jury. Defendant was given an opportunity to cross-examine the witnesses in front of the jury concerning this evidence and did so. The defendant did not request a recess to prepare this cross-examination.
A discovery failure will not automatically require reversal. It is the duty of a court to review the record for a determination of whether any prejudice may have resulted from the noncompliance which caused the trier of fact to reach the wrong conclusion. State v. Ray, 423 So.2d 1116 (La.1982); State v. Marquer, 446 So.2d 1258 (La.App. 4th Cir.1984), writs denied, 450 So.2d 359 (La.1984) and 452 So.2d 168 (La.1984).
We cannot say that the district court judge abused the much discretion accorded him by law in failing to grant a mistrial under the particular facts and circumstances of the instant case. The defendant was given an opportunity to discover the undisclosed evidence at the trial and was permitted to cross-examine concerning same. No recess was requested to prepare the cross-examination. The defendant presented to the jury by way of his cross-examination all of the available facts concerning the “working” lineup identification. The jury, after considering this evidence, apparently reached the conclusion that the victim’s identification of the defendant was accurate and valid. The failure of the State to disclose the fact of the “working” lineup, although possibly improper, constituted harmless error. Cf. State v. Washington, 407 So.2d 1138 (La.1982); State v. Anderson, 440 So.2d 205 (La.App. 3rd Cir.1983), writ denied, 444 So. 2d 1241 (La.1984).
This assignment of error is without merit.
ADMISSIBILITY OF “REGULAR” LINEUP
(Assignment of Error 1)
Defendant assigns as error the ruling of the trial court allowing the introduction of the “regular” photographic lineup. Defendant argues that because the victim had already made an in-court identification, any probative value of the “regular” lineup display was outweighed by its prejudicial effect, citing Rule 403 of the Federal Rules of Evidence and State v. Bray, 292 So.2d 697 (La.1974). Defendant also contends that the “regular” lineup identification created a question in the minds of the jurors of how the police were able to obtain a photograph of defendant so quickly.
Detective Charles Mondrick testified that, based on the information supplied by the victim, he obtained a copy of a driver’s license photograph of defendant from the Motor Vehicle Division of the state police. It is therefore impossible for the jury to have reached an erroneous conclusion regarding the origin of defendant’s photograph.
The defendant has cited no authority to us which makes Rule 403 of the Federal Rules of Evidence controlling on *861 evidentiary rulings in a Louisiana district court. Bray is distinguishable because it deals with gruesome photographs of a victim. Evidence of prior identifications by a victim is relevant and admissible. State v. Williams, 402 So.2d 678 (La.1981); State v. Morgan, 444 So.2d 325 (La.App. 1st Cir.1983); McCormick’s Handbook of the Law of Evidence, § 251 at 603 (E. Cleary 2nd ed. 1972).
This assignment of error, is without merit.
DECREE
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.