418 So.2d 1344 (1982)
STATE of Louisiana
v.
Kenneth J. SHARP, Jr.
No. 81-KA-2385.
Supreme Court of Louisiana.
July 2, 1982.
Rehearing Denied October 1, 1982.
*1345 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Pat Leitz and Abbott J. Reeves and William C. Credo, Asst. Dist. Atty., for plaintiff-appellee.
Fred Kleppner, Grisbaum & Kleppner, Metaire, for defendant-appellant.
LEMMON, Justice.[*]
In this case a Vietnam veteran was convicted of first degree murder of his aunt's husband during an incident in which the aunt was also killed and her child injured by stabbing.[1] His appeal primarily presents the issue of the sufficiency of the evidence supporting the jury's rejection of defendant's plea of not guilty by reason of insanity from Vietnam Syndrome.[2]
The facts are essentially undisputed.[3] Defendant worked as a mechanic following *1346 his graduation from high school. He was drafted into the army, and he served in an infantry company, which was involved in extensive combat during the Vietnam War. According to the medical history given by his psychiatrist, defendant encountered the carnage of that ill-fated jungle battleground during the approximately 11 months he served in Southeast Asia. He apparently killed many enemy soldiers and saw many of his comrades killed. The record left little doubt that this young conscript infantry soldier was indelibly scarred psychologically by his confrontations with death and destruction. Whether those "psychological scars" rendered him incapable of distinguishing right from wrong, when faced with a physical assault ten years later, was the crucial issue for the jury at his trial.
After he returned to civilian life, defendant began to date a young woman named Betty Bobinger, who was the sister of Joseph Bobinger, his aunt's husband. Betty, who had two children from a prior union, and defendant married and had a child of their own, and defendant also adopted the two other children. Although defendant was apparently a very diligent worker and good provider, the marriage was marred by a series of episodes during which defendant would seemingly explode with rage. These episodes usually resulted in defendant's beating his wife, but on at least one occasion defendant threatened suicide and threatened to harm his children. Although authorities contacted during these episodes advised defendant to seek professional guidance, he was never really evaluated by psychiatrists until the killings which resulted in his arrest.
Eventually defendant's wife, after time and again forgiving his outbursts, decided to conclude the marriage. She moved in with Joseph and Bernadine Bobinger, her brother and sister-in-law. Because his wife and children obviously meant a great deal to him, defendant was very upset about the separation.
On the evening of February 16, 1980, defendant began drinking at his home. He called his wife several times, and his temper grew worse with each call. At about 9:30 p.m., after consuming several drinks, he went to the Bobinger residence, parking his truck around the corner. As he arrived, his children were leaving with friends to attend an evening parade. After the friends left with the children, defendant's wife told him to leave, but he followed her into the house. An argument erupted when defendant noticed that his estranged wife was not wearing her wedding ring, and he struck her. When she noticed that defendant's open knife was lying on the sofa near him, she fled into another room.
Hearing the commotion, Joe and Bernadine Bobinger entered the room and ordered defendant to leave their home. When he refused, they shoved him toward the door. In the violent encounter which followed, defendant was scratched and struck. At that point, he obviously became enraged and lunged at Mrs. Bobinger with a knife, inflicting a fatal stab wound in her chest. Mr. Bobinger grabbed defendant, and they fought over the knife. During the struggle Mr. Bobinger suffered multiple stab wounds, one of which severed a major blood vessel. The ferocity of the wounds indicated that they were inflicted by a person trained to kill with a knife.
The Bobinger's son attempted to intervene on behalf of his parents, but fled when defendant turned the knife toward him. As young Joseph Bobinger, Jr. ran for his life from his house, he noticed defendant also in flight. Defendant ran down the street and disappeared into the night.
The Bobinger youth returned home to find a nightmarish scene. His mother and his father were still alive in the midst of their blood soaked living room, but despite prompt police and medical assistance, both Mr. and Mrs. Bobinger died soon after defendant's attack.
In the meanwhile, defendant had gone to a convenience store, where he contacted out-of-state relatives and then waited for the police to arrive. He was taken into custody and advised of his rights, after which he admitted that he had stabbed Mr. *1347 Bobinger, but claimed he didn't know whether he had stabbed Mrs. Bobinger. He Blamed the stabbings on his drunkenness.
He was subsequently indicted for first degree murder and entered pleas of not guilty and not guilty by reason of insanity.
During his trial two psychiatrists and a clinical psychologist opined that defendant, as a result of his battlefield experiences, was suffering from a "post-traumatic stress disorder".[4] One of the psychiatrists and the psychologist also testified that defendant was suffering from paranoid schizophrenia. Psychological test results showed that defendant was aggressive, particularly when under stress or when drinking. The thrust of the testimony of the defense experts was that defendant, when confronted with the stress of being rejected by his wife and then being assaulted by her relatives, in effect acted in a "state of primitive rage" based on a "survival instinct". As one of the psychiatrists put the matter, defendant "resorted to survival tactics, just striking out blindly, and not knowing what he was doing was wrong".[5]
The defense experts portrayed defendant's mental condition as an uncontrollable sort of "rage reaction", during which time defendant was incapable of distinguishing right from wrong. All three acknowledged upon cross-examination that defendant probably was sane (in that he knew right from wrong) when he first arrived at the Bobinger residence, as well as when he was interviewed by the police a couple of hours after the killings. Thus, the jury was in effect presented with a temporary insanity defense.
In rebuttal the state called a psychiatrist, who differed radically in his assessment of defendant's psychiatric condition. The state's expert described defendant as having an "explosive personality disorder". He opined that defendant was nervous and had problems with his temper that worsened after his Vietnam experiences. He was convinced, however, that defendant was able to control his anger to a great extent, confining his temper displays to his wife and family. The doctor was satisfied from his evaluation that defendant was not schizophrenic and was aware of the difference between right and wrong at the time of his knife attack on the Bobingers. He noted that it was hard to imagine that defendant thought his aunt was a threat to his life.
The jury was thus required to decide the case on the basis of this conflicting expert testimony, as well as similarly conflicting lay evidence. Defendant's father, mother and brother described "abnormal" conduct by him following his return from the military, while his wife testified that his behavior was essentially normal.[6]
The jury rejected the insanity defense and found defendant guilty as charged, subsequently recommending that he be sentenced to life imprisonment. The trial court denied defendant's motion challenging the jury's verdict, and defendant appealed.
The issue presented is whether the evidence, viewed in a light most favorable to the state, was such that a rational juror could have found that defendant failed to prove his insanity by a preponderance of evidence.[7] See State v. Claibon, 395 So.2d *1348 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981); State v. Lee, 395 So.2d 700 (La. 1981).
In the Roy case, there was no substantial conflict in the evidence and this court concluded that no rational juror, viewing the evidence in the light most favorable to the prosecution, could have found that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
In the present case, the evidence (particularly the medical evidence) was in substantial conflict, and there was ample evidence to support either verdict the jury decided to render. When there is conflicting evidence on the issue of insanity at the time of the offense, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence (as long as the jury was properly instructed and no evidence was prejudicially admitted or excluded), and the jury's verdict should not be overturned unless no rational juror could have found, on the evidence viewed in the light most favorable to the prosecution, that defendant failed to prove by a preponderance of the evidence his insanity at the time of the offense.
We cannot conclude in the present case that the evidence was insufficient for the jury to reject the opinions of the defense experts that defendant became "temporarily insane" when he killed the two victims. There was ample evidence to support the jury's resolution of the conflicting testimony. The burden of proof was upon defendant, and the jury's finding that defendant failed to carry that burden was not without support in the record.
Because there was evidence to support either verdict the jury decided to render, it is important to review defendant's other major assignment of error concerning factors which might have improperly affected the jury's decision. These assignments of error relate to the state's questions of the defendant's expert and the state's reference in oral argument concerning the prospects of release back into society of a person found not guilty by reason of insanity.
During the trial the prosecutor questioned defendant's expert concerning a verdict of not guilty and not guilty by reason of insanity as follows:
"Doctor, you said that you spent some time working in the mental institution at Jackson?"
"Yes, I was there about a year."
"Do you know what happens to people who are found guilty, after an opinion has been given that they are able to go back out into society?"
Defense counsel objected. The trial judge at first overruled the objection, but then sustained it, advising the jury that he would instruct them on the law relating to the handling of a person found not guilty by reason of insanity.
The prosecutor then asked, without objection, if defendant in his opinion could ever return to society. When the doctor testified that defendant could conceivably return to society, the following colloquy occurred:
"Q. But there is a possibility that he could slip back into the active paranoid schizophrenia?"
"A. Yes, it's possible."
"Q. It's quite possible that he could come into a stressful situation again, isn't it?"
"A. Yes."
"Q. And it's possible that he could kill again, isn't it?"
Defense counsel objected and moved for a mistrial. The trial judge sustained the objection and instructed the jury to disregard the last question, but denied the motion for mistrial.
During closing argument, the prosecutor made the following remarks:
"First, Joseph Bobinger died by bleeding to death. Walked around, talked, spoke to his young child while he was standing there dying in front of him. The blood was draining from his body until there was nothing left"
Defense objected to prosecutor's remark, argued that the prosecutor intended to inflame *1349 the jury and moved for a mistrial. The trial judge denied defense counsel's motion and cautioned the prosecutor not to go beyond the evidence.
During rebuttal argument, the prosecutor stated:
"And yes, ladies and gentlemen, if this man is found not guilty by reason of insanity he will be sentenced to an insane asylum and after six months he can be released back into society, back on the street, back where a stress problem might cause him to murder maybe one, maybe two, maybe three people the next time. In six months, ladies and gentlemen, he can be released. I submit to you that if he is released you better grab the babies and lock up the doors"
Defense counsel objected and again moved for a mistrial. The trial judge sustained the objection and instructed the jury to disregard the remarks, but denied the motion for mistrial.
Defense counsel argues that the prosecutor's remarks were inflammatory and designed to prevent the jury from returning an obvious verdict of not guilty and not guilty by reason of insanity.
The trial judge properly handled the questioning of defendant's expert concerning the possibility of future release. The trial judge sustained the objection to the first inquiry, stating that he would instruct the jury as to the law. When the prosecutor later asked the argumentative question about the possibility of defendant's killing again, defense counsel immediately objected, and the trial judge properly sustained the objection and admonished the jury to disregard. While the question was improper, it was not so prejudicial as to warrant the drastic remedy of mistrial, and the trial judge correctly ruled that the admonition was sufficient.
The comments during closing argument present a more difficult question, particularly the comment about grabbing the babies and locking the doors, which not only argued outside the record, but also appealed to fear. Nevertheless, this court has not reversed convictions because of improper closing arguments unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict.
The comment must be considered in the context of the entire closing argument and in the light of the trial court's subsequent instruction on the issue. The comment, which came at the outset of rebuttal argument, brought on an immediate objection, which the trial judge quickly sustained and admonished the jury to disregard. Thereafter, the prosecutor properly confined his argument to the evidence and lack of evidence and the reasonable conclusions that may be drawn therefrom. The judge then instructed the jury at length about the statutory procedure for handling a person who is found to be not guilty by reason of insanity.
The comment was improper, and we denounce such tactics. Nevertheless, we cannot say that the trial court abused his discretion in refusing to order a mistrial after admonishing the jury to disregard the comment. See State v. Dupre, 408 So.2d 1229 (La.1982).
The conviction and sentence are affirmed.
DENNIS, J., dissents with reasons.
AUGUSTINE, J., ad hoc, dissents and will assign reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
The prosecutor's questions and remarks deprived the defendant of a fair trial. Because of his questions and remarks, I am "thoroughly convinced," if that is the standard this court applies, that the defendant was not tried on the question of whether he knew the difference between right and wrong but on the legally irrelevant question of whether "a stress problem might cause him to murder ... maybe three people the next time." Furthermore, at least in a capital murder prosecution, in which a higher degree of certainty is required, this court should apply a more stringent standard to prosecutorial misconduct. We should be *1350 thoroughly convinced that comments which we denounce and think are wholly improper did not influence the jury and contribute to the verdict. See State v. Gibson, 391 So.2d 421 (La.1980). Otherwise, our denunciations will be perceived as hollow and lead to deprecation of the law and the judgments of this court.
NOTES
[*] Judge H. Charles Gaudin of the Court of Appeal, Fifth Circuit, and Judges Israel M. Augustine and Philip C. Ciaccio of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, with Associate Justices Calogero, Dennis Watson and Lemmon.
[1] See R.S. 14:30(3), which defines first degree murder as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm upon more than one person.
[2] Defendant's other contentions lack any arguable merit and are treated in an unpublished appendix which is attached to this opinion and is part of the official record in this case.
[3] The facts regarding defendant's background and military service were presented in the testimony of his parents and brother and in that of the expert witnesses who related what defendant had told them. Defendant did not testify in his own behalf.
[4] A counselor for the Veterans Administration was also permitted to testify as to his conversations with defendant concerning defendant's battlefield experiences. The counselor was permitted to testify as an expert in social work, specializing in counseling veterans who suffered from emotional problems.
[5] Defense counsel does not argue that defendant acted in self-defense. R.S. 14:20. Defendant was unlawfully attacking his wife when the victims intervened. R.S. 14:22. As the aggressor, he was not entitled to claim self-defense. R.S. 14:21.
[6] She testified that his behavior was essentially normal other than when, after brooding, he flew into a state of rage and beat her. She portrayed him otherwise, not unsympathetically, as a loving father and good provider for his family.
[7] In Louisiana, the Legislature has adopted the traditional rule in McNaughten's case, R.S. 14:14, and has placed the burden of proof on defendant. C.Cr.P. Art. 652. Compare United States v. Brawner, 471 F.2d 969 (D.C.Cir.1972), for a discussion of the insanity defense in the United States courts.