NORRIS, Judge.
The defendant, James C. Gladney (also known as James Harper), was indicted for the aggravated rape and armed robbery of “Susan” in violation of La.R.S. 14:42, 64. He proceeded to a jury trial and was found guilty on both counts. The district court sentenced him to life and 40 years at hard labor, both without benefit of probation, parole or suspension of sentence. The court subsequently granted an out of time appeal in which Gladney urges three assignments:
“(1) The Court erred in sustaining the State’s objection to testimony proffered for the purpose of corroborating the source of acquisition of a pistol found on defendant which was the same pistol taken by the party who raped the victim.
“(2) The Trial Court erred in refusing to sustain the defendant’s objection to the prosecutor’s comments during closing argument wherein the prosecutor stated that the defendant had been previously tried in connection with certain cases and that he had told his story to the jury then and that the jury didn’t believe him then when there was no evidence that there had ever been any prior trial and in fact there never had been any trial.
“(3) The Appellate Court should take note of any error patent on the record.”
We find no reversible error and therefore affirm the convictions and sentences.

Facts

Around 6:30 a.m. on July 24, 1981 “Susan” and her then-fiancé (now husband) “Bobby” left their ground-floor apartment in Fountainbleau Apartments in Bossier City. Susan drove Bobby to work in Shreveport and then returned to their apartment between 7:20 and 7:30. She entered and shut the door behind her but did not lock it because she intended to step back outside and buy a newspaper from a nearby paper rack.
As Susan was searching in her pocketbook for change, she suddenly heard a man standing right behind her say, “Don’t move.” She turned around and saw an intruder standing in the doorway and pointing a loaded gun at her. Although Susan told him no one else was at home, the intruder led her around the apartment to assure that they were alone. He then walked her back to the livingroom couch and ordered her to lie down; he raped her.
After this he ordered her, still at gunpoint, to give him money. Frustrated that Susan’s billfold was empty, he led her around the apartment again, this time in search of things to take. He took about $40 in coins from Susan’s children’s piggy-bank; Bobby’s high school class ring from Kubasaki High School in Okinawa (the intruder commented he had been in Okinawa before); Bobby’s .38 Llama revolver; a bottle of Crown Royal whiskey; and the Crown Royal cloth bag to carry it all.
After first threatening to tie her up in the bathroom, the intruder ordered Susan into the bedroom closet and pushed a chest of drawers in front of the door. The intruder then left as silently as he had entered. Susan waited in the closet, terrified, for several minutes before pushing the chest away, climbing out a window and fleeing to her mother-in-law’s house. She was taken to Bossier General Hospital and examined by Dr. McCormick. That afternoon she went to the police station, reported the incident and gave a description of the assailant to Detective Sproles. Meanwhile Detective West investigated Susan’s apartment and found it “ransacked.”
Because five similar early-morning incidents had occurred in the vicinity in a space of 10 days, Bossier City Police conducted a stake-out of apartments in the area. Officers gathered from other victims a description of the suspect’s dark blue and silver mid-size car, perhaps a Mercury Cougar; and from Susan and others a description of the suspect as a black male of medium height and muscular build, wearing a mod *1181 erate afro and long sideburns. As part of the stake-out Detective West took an unmarked patrol car to Fountainbleau Apartments at 3:45 a.m. on July 31.
About 4:30 Det. West saw an Olds Cutlass with a dark blue Landau roof and a silver body drive into the parking lot and back into a space not far away. The driver, a black male, turned off his headlights but sat in the car for some time with the dome light on; he appeared to be looking at something on the steering wheel or his lap. Det. West drove by the suspect’s car twice and parked in the suspect’s plain view with parking lights on and engine running. Within 30 seconds the suspect turned off his dome light, cranked the engine and started out the parking lot onto East Texas Street; Det. West followed him. Reinforced by Officer Cowan, Det. West stopped the suspect’s car on Airline Drive.
The suspect produced a driver’s license that read “James C. Gladney” of Princeton, La. but he told the officers his name was “James Harper.” Gladney explained the difference by saying he had two birth certificates. When asked why he was at Fountainbleau Apartments at such an hour, he said he was reading a book and Founta-inbleau was a good place for reading. He consented to a search of his car; officers found two pornographic magazines (the nature of the magazines was withheld from the jury) and a .38 Llama revolver, like the one reported stolen from Susan’s apartment. Gladney also told the officers his sister lived in the apartments. The officers Mirandized him and asked him to the station for questioning.
At the station Gladney was Mirandized again and placed under arrest. He told officers he had bought the gun from a man named Johnson on Sprague Street two or three months earlier. An inventory search of Gladney’s person turned up a high school ring from Kubasaki with Bobby’s initials in it. Gladney explained he bought the ring from the same Johnson, but about a week before his arrest. Police found the serial number of the gun seized from Glad-ney’s car matched the one owned by Bobby. A check of the Cutlass’s license number traced it to an address in Princeton, La.; police also determined that no relative of Gladney’s was living at Fountainbleau Apartments.
Later that day Gladney participated in a lineup which his attorney supervised. Susan positively identified Gladney as her assailant. Bobby also identified the ring as his own.
A Bossier Parish grand jury returned the instant true bill on August 17, 1981, charging Gladney with aggravated rape and armed robbery; he pleaded not guilty. Various motions to suppress were heard and rejected on September 23; trial on the merits was held on October 28 and 29, 1981. As noted, the jury found him guilty as charged. Sentences were imposed on January 19, 1982. The district court granted an out of time appeal on March 13, 1990.

Hearsay Testimony

By his first assignment Gladney urges, in essence, that the trial court erred in excluding as hearsay his testimony about how he acquired the .38 Llama revolver which was found in his car on July 31 and was proven to have been stolen from Susan’s apartment a week before. Gladney argues this testimony was not hearsay and was relevant to prove his motive and state of mind before buying the gun.
At trial Gladney testified that a week or two before July 24, he had talked to a man named “Red” (whose last name he did not know) about buying a gun for his wife. On the evening of the 24th Gladney and his friend Reggie Hicks went to a place called the “Gambling Shack” (its exact location was not given) and met up with “Red,” who told them how to get a gun. The state objected to testimony about what Red said as hearsay; the defense argued it was being offered not for the truth of what Red said but to prove why Gladney acted in the manner in which he acted. The court sustained the objection.
As a proffer and out of the jury’s presence Gladney was allowed to testify that Red told him he knew someone with a gun to sell and gave him instructions how to *1182 find this person. Gladney did not mention any other details of what Red told him.
When the jury returned Gladney testified that as a result of his conversation with Red, he went to the Sprague Hotel, met a woman named Barbara (whose last name he did not know) and learned from her how to find his contact, a man .named “J.J.” Inside the hotel J.J. produced a cigar box that contained a .38 and a high school ring from Kubasaki. After some dickering, Gladney bought both items for $30.
Gladney’s running buddy that evening, Reggie Hicks, testified and corroborated that he and Gladney went to the Gambling Shack. He did not mention accompanying Gladney to the Sprague Hotel. Neither Red, Barbara nor J.J. was present to testify, though Gladney insisted he reported J.J. to the police and no action had been taken.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La.C.Ev. art. 801 C; State v. Martin, 458 So.2d 454 (La.1984). Hearsay is normally excluded because the value of the statement rests on the credibility of a declarant who is not in court and thus not subject to cross-examination and other safeguards of reliability. La.C.Ev. art. 802; State v. Weedon, 342 So.2d 642 (La.1977). When an out-of-court statement is offered for a purpose other than to establish that the assertion therein is true, then the value of the statement does not depend on the absent declarant’s credibility and the statement falls outside the general exclusionary rule. State v. Martin, supra.
The contested portion of Gladney’s testimony was plainly hearsay. Gladney was trying to relate what Red told him. The purpose of the testimony, though never clearly stated, was obviously to show that Gladney did not steal the .38 Llama revolver in the armed robbery; rather, that he bought a gun (and a ring) which he knew were recently stolen because Red told him so. Red’s statement, if admitted, would supply the necessary link to show that Gladney intentionally possessed a stolen gun but did not commit the crimes charged. In other words, the truth of what Red told Gladney was critical to Gladney’s purpose in offering it.
Gladney was entitled to explain why he acted as he did; his reason for going to “The Bottoms” instead of to a gun or pawn shop was a matter of his personal knowledge and admissible. La.C.Ev. art. 602. In accord with standard trial technique to avoid hearsay, he testified that as a result of his conversation with Red he went to the Sprague Hotel and bought a gun. This was proper. Other details of what Red told him were irrelevant to Gladney’s purpose in going to where he went to buy a gun. And if Red’s statement was that the gun was recently stolen, it could be advanced only to prove the truth of the matter asserted therein; this is simple hearsay and inadmissible. La.C.Ev. art. 802. The trial court did not err in excluding it.
Gladney further argues that the testimony was offered to show his own motive, purpose or plan in going to Sprague Hotel. The code provides an exception to the hearsay rule for a declarant’s state of mind:
Art. 803. Hearsay exceptions; availability of declarant immaterial
The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * *
(3)Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s testament.
This exception applies only when the state of mind of the declarant (here, Red), not the state of mind of the hearer (Glad-ney), is the subject of inquiry. See La. *1183 C.Ev. art. 803(3), Comment (c); Author’s Notes (5). Red’s statements could have been introduced as admissible hearsay to prove Red’s state of mind, intent, plan or motive. They were not admissible to prove Gladney’s state of mind; Gladney’s own testimony was sufficient for that purpose. This exception does not apply to the contested testimony.
The trial court did not err in sustaining the state’s hearsay objection.

State’s rebuttal argument

By his second assignment Gladney urges the trial court erred in refusing to sustain his objection to certain comments in the state’s rebuttal argument. The objection arose in the following manner.
When Gladney took the stand, his counsel asked him if he had been in the Marine Corps and if anything unusual had happened to him at that time. Gladney replied that he had been court-martialed because he was convicted of armed robbery and sentenced to Leavenworth. Counsel asked Gladney for the circumstances surrounding the court-martial; the prosecutor objected on grounds that counsel could not impeach his own witness; the court sustained the objection, thus keeping out any further details of Gladney’s prior conviction.
In the defendant’s summation, counsel again referred to the matter:
When we first started out we discussed the meaning of a prior conviction in a case like this and say let’s use this prior conviction to determine the credibility of a witness. Now you will recall when James took the stand I was the one that asked James to start telling you about the trouble he had been in. You will also remember after he said that he had been in trouble and what it was, I wanted you to hear, at least hear his explanation of what happened. You didn’t get to hear that. The district attorney cut me off. He stopped me. I want you to consider that. R.p. 499.
In rebuttal, the prosecutor argued:
[Defense counsel] mentions that he brought out the conviction of the defendant. Well the reason he brought that out is because if he hadn’t I sure would have, and he knew that and that’s the common defense ploy, they try to bring it out ahead of time just so you — it won’t look like they were trying to hide anything. Because he knew — he knew I was going to bring it out. He said I wouldn’t give him a chance to go into the details. Well I don’t want to get in a situation here where he’s going to give you his side of what happened back there and I’m not in any position to tell you what the other side was because I wasn’t there. That man had a chance for his trial out * * * there, he was tried, and I’m sure he told his story out there and evidently the jury that tried him didn’t believe him. So I don’t want even to get — to be able to tell you people half of a story and I don’t get to tell the other half because evidently the other half is the half that won that particular case. R.p. 508.
Defense counsel objected, urging there was no evidence that Gladney ever went through a trial and was found guilty. Counsel did not ask for a mistrial or admonition. The trial court overruled the objection. Gladney now argues this was error; that the prosecutor’s argument created prejudice by urging that if a prior jury disbelieved Gladney’s testimony, then this jury should do likewise.
The scope of argument is set forth in La.C.Cr.P. art. 774:
Art. 774. Argument; scope
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state’s rebuttal shall be confined to answering the argument of the defendant.
As a general rule, factors affecting the credibility of a witness are permissible subjects for closing argument when the facts bearing on the witness’s credibility appear in the record. State v. Byrne, *1184 483 So.2d 564 (La.1986), cert. denied 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Procell, 365 So.2d 484 (La.1978), cert. denied 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). The fact of a prior conviction is relevant to the defendant’s credibility. La.C.Ev. art. 609.1; State v. Brown, 337 So.2d 484 (La.1976); State v. Anderson, 206 La. 986, 20 So.2d 288 (1945), cert. denied 324 U.S. 868, 65 S.Ct. 913, 89 L.Ed. 1423 (1945). Both state and defendant may draw reasonable, if not entirely accurate, inferences from legitimately established facts. State v. Moore, 432 So.2d 209 (La.1983), cert. denied 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); State v. Lockett, 332 So.2d 443 (La.1976).
The defense introduced evidence of Gladney’s prior conviction and then argued that he could have satisfactorily explained the conviction had not the prosecutor stopped him. The implication was that Gladney’s honesty in owning up to his past mistakes reflected well on his credibility. The state was entitled to answer this argument. Admittedly Gladney only said he “was convicted.” However, the prosecutor’s remark that “I’m sure” Gladney told his side of the story at trial and “evidently” the jury did not believe him was a conclusion the state was permitted to draw from the fact of the conviction and the defense’s closing argument. See State v. Morris, 404 So.2d 1186 (La.1981). The state’s rebuttal was not improper and the trial court did not err in refusing to sustain the objection.
Moreover, a reversal because of improper closing argument is not required unless the reviewing court is thoroughly convinced the remarks influenced the jury and contributed to the verdict. State v. Sharp, 418 So.2d 1344 (La.1982); State v. Robinson, 485 So.2d 156 (La.App. 2d Cir.), writ denied 488 So.2d 1018 (1986). Here the evidence of guilt was overwhelming. Susan positively identified her assailant both at an impartial lineup and at trial; she and Bobby positively identified the gun and ring found in Gladney’s possession as those taken in the armed robbery; Mr. Wojtkiew-icz’s analysis of samples taken from Susan, Bobby and Gladney placed the odds at 1 in 165,000 that the rapist was someone other than Gladney. The evidence as to Glad-ney’s credibility was not much better; on the morning of his arrest he gave inconsistent statements to the police as to why he was in the Pountainbleau parking lot; his initial statement to the police and his trial testimony about when he “bought” the gun were inconsistent; at trial he admitted a prior conviction for armed robbery. If the prosecutor’s remark about that prior conviction was slightly more expansive than the evidence presented, it was harmless beyond a reasonable doubt. La.C.Cr.P. art. 921; State v. Robinson, supra. This assignment lacks merit.

Error patent review

By his third assignment Gladney asks this court to exercise its statutory authority to examine the record for error patent. La.C.Cr.P. art. 920(2). We have closely studied the entire record and find nothing we consider to be error patent.
For these reasons the convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.