STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1003

STATE OF LOUISIANA

VERSUS

JOEL T. BAILEY

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-862-2007
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Judge Ulysses Gene Thibodeaux, Chief Judge, James T. Genovese, and Shannon J. Gremillion, Judges.

AFFIRMED.

David W. Burton
District Attorney, 36th Judicial District Court
P. O. Box 99
DeRidder, LA 70634
(337) 463-5578
COUNSEL FOR APPELLEE:
    State of Louisiana

Richard Alan Morton
Assistant District Attorney, 36th Judicial District Court
P. O. Box 99
DeRidder, LA 70634-0099
(337) 463-5578
COUNSEL FOR APPELLEE:
    State of Louisiana

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Joel T. Bailey**

**GREMILLION, Judge.**

Defendant, Joel T. Bailey, shot his parents, Eugene and Dorothy Bailey. Defendant fled and was apprehended four days later in Woodville, Mississippi.

Mr. Bailey died at the scene as the result of a shotgun blast to the head fired at contact range. However, Ms. Bailey was transported to the hospital and survived her injuries.

Defendant was charged with first degree murder, a violation of La.R.S. 14:30, and attempted first degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30. Defense counsel stipulated that Defendant, who was a diagnosed schizophrenic, was competent to stand trial and entered a plea of not guilty and not guilty by reason of insanity. The trial court found Defendant incompetent to stand trial.

Three-and-a-half months later, the trial court again found Defendant lacked the capacity to proceed and ordered an assessment at the East Feliciana Forensic Facility to restore him to competency. At a hearing five months later, the trial court found Defendant competent to proceed to trial.

After a jury trial, Defendant was found guilty as charged on both counts. A Motion for New Trial was denied. Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for first degree murder. For the offense of attempted first degree murder, Defendant was sentenced to forty years at hard labor without benefit of probation, parole, or suspension of sentence. The trial court ordered the sentences to be served concurrently.

Defendant is now before this court asserting two assignments of error: First, he contends the trial court erred in finding him guilty of the crimes charged.

Second, he argues the trial court erred in denying his Motion for New Trial.  We

find the evidence was sufficient to support Defendant's convictions.

**ASSIGNMENT OF ERROR NUMBER ONE**

In his first assignment of error, Defendant contends the trial court erred in

finding him guilty of the crimes charged.  Defendant does not allege that he did not

shoot his parents on September 9, 2007, but contends he should have been found

not guilty by reason of insanity.

Under La.Rev.Stat. 14:14:

> If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.

However, in Louisiana there is a legal presumption that the defendant is sane and responsible for his actions.  La.Rev.Stat. 15:432; *State v. Poree*, 386 So.2d 1331 (La.1979).   Therefore, to overcome this presumption of sanity, the defendant has the burden of proving by a preponderance of the evidence that he suffered a mental disease or a mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question.  La.Code Crim. Pro. art. 652; *State v. Armstrong*, 94-2950, pp. 4-5 (La.4/8/96), 671 So.2d 307, 309; *State v. Silman*, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32; *State v. Peters*, 94-0283, pp. 8-9 (La.10/17/94), 643 So.2d 1222, 1225-26.   Sanity is a factual matter for the jury, to be determined from all of the evidence, both lay and expert, along with circumstances surrounding the events and testimony relating to the defendant's behavior before, during, and after the crime.  *State v. Price*, 403 So.2d 660, 663-64 (La.1981); *State v. Claibon*, 395 So.2d 770, 772 (La.1981); *State v. Roy*, 395 So.2d 664, 668-69 (La.1981). A determination of the weight of the evidence is a question of fact that rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted.  *State v. Silman*, 95-0154, p. 12, 663 So.2d at 35.

> In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could

2

conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283, p. 8, 643 So.2d at 1225; *State v. Armstrong*, p. 4, 671 So.2d at 309; *State v. Nealy*, 450 So.2d 634, 639 (La.1984).

*State v. Williams*, 07-1407, pp. 7-8 (La. 10/20/09), 22 So.3d 867, 875-76, *cert. denied*, __ U.S. __, 130 S.Ct. 3278 (2010).

There is no dispute that Defendant is mentally ill and has been for many years. The law, though, requires that Defendant show that he was not only mentally ill, but also that the nature of his illness was of such a kind and quality that it "prevented him from distinguishing between right and wrong" at the moment he shot his parents.

If the standard was that we consider this record in a light most favorable to Defendant, we would be hard-pressed to affirm the conviction. Every single witness, be they lay or expert, called Defendant's sanity into serious question. In fact, it took three hearings and the better part of a year to "restore" Defendant's competency to stand trial. Furthermore, only one of three doctors believed that he knew right from wrong, and even that doctor believed Defendant was suffering from paranoid schizophrenia.

We must consider the evidence in the light that most favors the State, which the jury found convincing. We accord great weight to the jury's verdict, and we may not alter it unless it there is no reasonable factual basis for its finding. We must affirm Defendant's convictions because there is a rational basis for the jury's finding that Defendant was not legally insane at the time he shot his parents.

*Fact Witnesses*

Detective Mark Herford testified that Defendant was not present when police arrived at the Bailey residence on the date of the offenses. Defendant left the scene without his wallet, drove until he ran out of gas, and left his vehicle on

3

the side of the road. He was subsequently located under a bridge in Woodville, Mississippi. When Defendant was found, he was only wearing boxer shorts.

The report of Officer Adam Speeg, the officer who found Defendant on September 13, 2007, recounted Defendant's interaction with him and was read to the jury as follows:

> When I first made eye contact with Mr. Bailey he was walking underneath the southbound side of the Homochitto River Bridge wearing nothing but boxer shorts. After walking to and making physical contact with Mr. Bailey, he seemed to be nervous at first but got more relaxed as we started to converse. When asked what he was doing underneath the bridge, he stated that he was scared to walk on the roads because somebody might be looking for him. I asked who would be looking for him and he said he didn't know. When asking him what his name was, he did not hesitate to tell me. When asked about where his truck was, he said he wasn't sure. I asked about his clothes and he stated he took them off to swim the night before, and when the river got high, the water took his clothes. After seeing my patrol car, Mr. Bailey asked if I was a Mississippi Policeman. After asking him if he was cold and hungry, I told him that I would get him something to eat and something to wear if he came with me. He agreed to wear handcuffs and come with me. While we were on our way back to Woodville, Mr. Bailey did most of the talking. He would ask common questions about direction of travel. He asked how far to the nearest town, where was the closest road back to Louisiana. Mr. Bailey stated that after he left, he was thinking about going back to Louisiana. He would ask about my family and where I was from. He also asked little questions about the town of Woodville, such as what kind of jobs were there here, what was there to do on the weekends. When we got into jail the conversation slowed and Mr. Bailey stopped talking all together. During my entire contact with Mr. Bailey, he made no comments about his family or showed any remorse towards anything. He stayed relatively calm throughout our time together and did not demonstrate any signs of aggression or anger.

Deputy Joanne Farris went to Mississippi to pick up Defendant on September 14, 2007. Deputy Farris testified that Defendant was calm, polite, and happy he was going home. He responded appropriately when she asked him to do something. Deputy Farris testified that Defendant did not complain of hearing voices.

4

Detective Herford interviewed Defendant on September 14, 2007. Summarized portions of that statement follow.

When asked why he shot his parents, Defendant said he did not "shoot them or murder." Defendant stated he was walking in the hall with a gun, his father asked if it was loaded, Defendant proceeded to check, and somehow touched the trigger. Defendant reported holding the pump shotgun at his waist.

Defendant admitted throwing the gun over the bridge because he knew he would have to make a statement, and he did not want to "get in too much pressure and not make the right statement." Defendant further stated that he had to try to run a while to get it straight in his head because he thought he murdered them and had done it on purpose because it happened so quickly.

Defendant went on to tell police that the gun used to shoot his parents was in his room, and he loaded it while in the room. His father was leaving his own bedroom and asked Defendant if the gun was loaded. Defendant checked the gun and bumped the trigger. Defendant then stated he shifted the gun. He noted that he forgot that the gun was still loaded. He then stated he backed up and did not know what happened after that.

Defendant did not know where his father had been shot and did not look at him afterward. Defendant stated that he got scared, blacked out, and ran. He then grabbed the keys from his room. He did not check on his father and did not think or know his father was dead.

Police told Defendant his father had been shot in the side of the head, and the bullet exited through the top of his head. When asked how this occurred, Defendant said he once struck his father and had a knife. He then called police because he needed help.

Defendant stated that it might be possible that he aimed the gun at his father. He then stated it might have happened exactly like police were saying. Defendant said he was having "bad voices" at the time. He also informed police that he was waiting on his medication to be increased. Defendant told police he was hearing voices that night. He further indicated he was "numb feeling." He said he did not feel angry.

Defendant did not know how close he was to his father when he shot him. Defendant said he did not put the gun to his father's head and pull the trigger. When asked if he raised the gun and shot his father, Defendant said: "That bound to have been what happened. That, that sounds like what happened."

Defendant stated that after he shot his father, he shifted the gun, walked back, turned his head, saw someone in the kitchen whom he did not know, and "shot 'em." When he looked down, it was his mother. Defendant stated he realized it was his mother after he fired the gun. Defendant said he intended to shoot the person but did not know it was his mother. Defendant further stated he did not say anything to her because he could not get his thoughts together.

Defendant told police he thought about his parents lying there and figured he would get away from the family long enough "cause his family is strong about killing." Defendant then laughed. He agreed that at that point, he knew what he had done was wrong. He knew if he waited for his family to get there "they might go in an outrage." Defendant further agreed that he knew he messed up and had done something bad. He said he wanted to get out of the way until police got there and saw what happened. He thought his brother would report the events to police when he got home from work at midnight.

6

Defendant denied picking up the spent shells from the floor. He stated he went into his room and got all his stuff. He further stated he grabbed all his shells and threw them over the bridge.

Defendant told police he went driving around to wait until the case was written up. When he went outside, he shifted the gun to make sure it did not have any shells in it. He then drove to Woodville and threw the gun and shells. He said he threw the gun where someone would find it. He then stated "when I got my mind clear."

Defendant said he was afraid to call 911. When asked if he was afraid of getting in trouble, he said, "I guess." Defendant wanted someone to be at the house when he came back so, if it was murder, he would not harm anyone else.

Defendant stated that while driving, he passed Angola, looked back, and said he might go back there. A few miles later, he ran out of gas. He then ended up at a creek. Defendant stated he drank river water. While under the bridge, a thunderstorm washed away his clothes. He later saw police and asked for a ride home. Defendant stated it was possible he was under the bridge hiding to try to gain time to get his story straight. He then stated he did not go in public because he did not have clothes on.

Defendant said he knew not to talk back to the voices he heard because no one was around. He described the voices as constant. He then stated he could not understand the voices. He indicated the voices did not tell him what to do. Defendant told police he was schizophrenic and took medication. He stated the medication made him slap himself.

Defendant was again questioned about the offenses. He said his father came out of the room yelling. Defendant stated he must have thought his father had his guns. He then stated "they" heard him shift the gun, and "they" came out. He said

7

it was loud, but nobody came out, then somebody came out. He then said, "[T]hey was [sic] coming out and they heard me shift the gun and gonna [sic] come out and find out who I was and shoot me." He further said his parents were not there when "they" came out. He said he thought someone was after him. He then said "it was like they was [sic] coming, it was like voices coming out with guns."

Defendant indicated he thought his mother was dead. He then admitted gathering things in the home and stepping over his father a couple of times. When asked if he went back in the kitchen to see if his mother was moving, Defendant began talking about his uncle firing an automatic weapon at Defendant's home. Defendant was then told his mother was alive. In response, he asked where she was hit. Defendant subsequently said he did not plan the events, but they did happen.

Detective Herford testified that police had received earlier reports involving Defendant. On April 19, 1995, police were called to Welcome Pentecostal Church by Hank Cooley who informed police that Defendant was inside the church threatening suicide and was not acting normal. Deputy Hall spoke to Defendant. Defendant told Deputy Hall that he was dead. When asked what he meant by dead, Defendant said he did not fit in "here." When asked if he would like to get help, Defendant stated he would like to go to Hopewell Cemetery. Defendant further told Deputy Hall that Billy the Kid was buried in his back yard and that Jesse and Frank James visited him the other day. Defendant spoke of going to cemeteries and seeing people that were not there. Defendant was transported to the emergency room at Beauregard Memorial Hospital. Dr. Coley Duncan diagnosed Defendant with acute psychosis. Defendant agreed to be transported to Crossroads Mental Health Facility in Alexandria.

8

On February 24, 1998, Dorothy Bailey made a missing persons report. She informed police that in the morning hours, Defendant advised her and her husband that he was going to the First United Pentecostal Church in DeRidder and had not returned home. Dorothy informed police that Defendant had been admitted to Charter Hospital in Lake Charles two years before. Dorothy was worried Defendant may be having mental problems similar to those that occurred in 1995. On March 1, 1998, Dorothy informed police that Defendant called home from Texas on February 27, 1998. Dorothy did not wish to reveal where Defendant called from and what had happened to his car. She further stated her son and husband had gone to pick up Defendant, and he was home and well.

On July 7, 1998, Defendant called police and told them he needed some help before he killed his father. Two deputies contacted Eugene Bailey who stated Defendant had mental issues, and his medication had been changed. Defendant told police he did not want to stay with his parents and wanted to leave. He further stated that if he stayed with his parents, he would kill them. Defendant was transported for evaluation.

Dr. Charlotte Fowler worked at Beauregard Mental Health Clinic in 2007. She treated Defendant on three occasions. Dr. Fowler testified that Defendant had been diagnosed with schizophrenia. She saw Defendant on September 6, 2007. At that time, he denied having hallucinations and homicidal tendencies. Defendant was worried about a job he was starting and wanted Dr. Fowler to increase his medication, which she did.

Deputy Terry Ray, an LPN, administered medication to Defendant at the Beauregard Parish Jail. Deputy Ray testified that at the time of trial, Defendant was taking three milligrams of Risperdal twice a day. Deputy Ray testified that during the three years she worked at the jail, Defendant never reported hearing

9

voices, and she never saw him respond to voices. Deputy Ray worked Monday through Friday from 6:00 a.m. until 4:30 p.m. She saw Defendant twice a day when she gave him medicine.

Deputy Ray testified that Defendant was taking the following medications until approximately three-and-one-half years before trial: 1) Atenolol – 50 milligrams once a day for blood pressure; 2) Diovan 80/12.5 milligrams once a day for blood pressure; 3) Haldol – twice in the morning and three times in the afternoon for psychosis; 4) Cogentin – 2 milligrams twice a day for psychosis; 5) Lexapro – 10 milligrams twice a day for depression; 6) Trazodone – multiple uses; 7) Zyprexa – 5 milligrams once a day for psychosis.

Deputy Ray was asked to read from Defendant's "Mental Health" records dated January 29, 2008, which stated: "'I have been struggling with the voice. I don't want to be around 'something' people.'" Deputy Ray took that to mean that Defendant had been struggling with hearing voices.

Dorothy Bailey testified regarding the offenses as follows:

> When I seen [sic] Joel first, he was in the living room walking kind of in an angle that way, and he was crouched down in a position, you would think it was like a -- a somebody in combat hunting an enemy, you know. And I -- when he swung, I heard a click and I never saw the gun to my knowledge -- I don't -- I didn't see the gun, but I heard it click when he turned, and I saw his eyes, and that's all I saw. And -- then I remember my husband's feet and legs, I saw them and undoubtedly I crawled to him, because I remember shaking his legs and I knew, you know, he was -- had died, you know. So, and the next really clear memory I have is my brother was shaking me while we were riding.

Dorothy did not remember seeing Defendant run from the house. Additionally, she did not recall if a commotion was occurring or seeing Defendant with a gun right before he fired it. Dorothy testified that the night before Defendant shot her, she saw his eyes. She testified "that was not Joel. That was not Joel. I know, that was not my Joel."

10

Dorothy testified regarding Defendant's behavior and mental condition. She testified that in the beginning, Defendant was depressed and had a nervous breakdown. Prior to Defendant being admitted to Crossroads, he was "exhibiting symptoms of you know restlessness like pacing, really just pacing and - and snapping fingers just over and over for - this for long periods of time. Starting to see and hear things that wasn't [sic] there . . . ." He was also mumbling and talking to himself a lot. He told his parents he was hearing voices and noises. Additionally, he saw people in trees in the woods. Dorothy testified that this behavior was erratic.

Dorothy related that in 1998, Defendant held a barbecue fork and told his father, "Now, daddy, don't try to stop me, cause I'm going to call them and let them come get me." Dorothy testified that Defendant had received new medicine three days before that incident, and he was subsequently taken to Moss Regional Hospital. Dorothy said there was no conflict or altercation at that time. When questioned about a report indicating she said there was an altercation between Defendant and his father, Dorothy testified as follows:

> Joel -- I was there when my husband gave the statement. He told the deputy that Joel stood with a barbecue fork, not a knife, and he said, "Daddy, I need to call them, I don't [sic] to ever hurt anybody. I don't want to hurt no one." So he called them himself. My husband said he sat down across the room, and said It's okay, Joel. It's going to be okay." Now what that is, I don't know. But that's what he told.

She again stated there was no altercation at that time.

Dorothy was asked how Defendant's symptoms were during the "time period prior to when this incident occurred." She testified his symptoms were getting more pronounced. Dorothy indicated that a month to two months before the offenses, Defendant was a little more agitated, and she and her husband were getting concerned. Defendant was showing signs of schizophrenia returning. Two

11

weeks before, he was starting to really hit himself and mumble. Dorothy testified that at her urging, Defendant told the doctor at Mental Health on September 6, 2007, that he needed more medication. The prescription for the increased dosage of medication was left at the pharmacy but not filled. Dorothy testified that Defendant had all the signs of an oncoming episode.

She further testified about Defendant's condition as follows:

> He was starting to have more signs of his illness, and we could hear in his room, he was really starting to hit himself a lot and jerk chairs, and he was talking a lot to himself, seeing things and he said hearing voices. So I told him, you tell them to put your medicine back up.

Dorothy testified that she did not believe Defendant knew what he was doing when he shot her and her husband.

Numerous other family members testified regarding Defendant's long-standing history of mental illness and provided detailed facts of bizarre incidences involving Defendant.

Dr. James Anderson was qualified as an expert in forensic psychiatry. Dr. Anderson testified that he kept records of the cases that he had been involved in since 1998. He was asked to give an opinion as to sanity in fifty-three cases, and, in ten of those cases, he felt the defendant was mentally ill at the time of the offense.

Dr. Anderson first became involved with Defendant when the trial court requested that he evaluate Defendant's competency to stand trial. He initially interviewed Defendant for sixty-five minutes at his office on October 18, 2007. At that time, he determined Defendant was competent to stand trial. Dr. Anderson was later hired by the defense to determine Defendant's sanity at the time of the commission of the offenses.

Dr. Anderson reviewed letters and maps found in Defendant's bedroom trash can; medical records from Beauregard Parish Mental Health Center Institute for Neuro-Psychiatry and the Beauregard Parish Jail; legal records including statements made by Defendant, Dorothy Bailey, Landry Bailey, Thomas Gray, Stuart Bailey, Lena Bailey, and Joanne Farris; and other legal records including the warrant, the arrest report, the arrest register, offense report, criminal history report, property receipt statement, probable cause statement, waiver of legal rights, and the answer to Defendant's motion for discovery and inspection. He also reviewed his previous competency evaluation, miscellaneous records such as notes Defendant had written on an inmate request form, the supplemental incident report, the Beauregard Parish Jail Complex incident report, and a Woodville Police Department report. He also interviewed Dorothy Bailey for one hour.

Dr. Anderson interviewed Defendant a second time on September 26, 2008, for ninety minutes. Neither of the interviews was recorded. During those interviews, Defendant never indicated he shot his parents because he was mad at them.

Dr. Anderson diagnosed Defendant with disorganized or undifferentiated schizophrenia. Dr. Anderson explained that schizophrenia is a psychotic disorder of thought process and thought content. He explained that Defendant had auditory, visual, and command hallucinations and delusions. Dr. Anderson testified that it was more common for an individual with a psychotic thought disorder to fake wellness than it was for a criminal to fake illness. He further explained that people with psychotic thought disorders want to be well and will not tell people they are hearing voices and seeing things. Dr. Anderson testified that even though a person is maintained on medication, that person can have exacerbations and remissions or periods of time when the disease is worse or better.

13

Dr. Anderson testified regarding Defendant's sanity as follows: "It's my opinion that he has a serious mental disease or defect; that disease is schizophrenia, and that as a result of his mental disease at the time this event occurred, he was not capable of distinguishing right from wrong, with reference to his conduct." Dr. Anderson further testified that it was his opinion, based on reasonable agreeable medical certainty, that it was more probable than not that Defendant's symptoms that rendered him insane existed at the time he shot his mother and father.

Dr. Anderson stated that a person could be actively psychotic and be legally sane. Dr. Anderson further stated he thought Defendant knew killing was not right. Dr. Anderson was asked about Defendant knowing right from wrong and testified as follows:

> [D]id he know that he was shooting his father and then his mother and did he know that he was doing something wrong? No, I don't believe he did. I believe he was in a psychotic state of mind and he didn't cognitively consciously murder his father. At some point did he recognize some horrid terrible thing had happened and he left? Yes. But he's never given a clear description of what -- what that was. Why he did it? What the circumstances were around it? I don't think he knows. I think what happened after that was his response to something terrible happening. And I think the records are consistent and bare [sic] that out. Knowing what I know of psychotic thought disorders.

Dr. Anderson was questioned about Defendant's statements during the mental health examination conducted on September 26, 2008, as follows:

> Q Okay. I mean he tells you that I put 2 shells in the gun, 1 for mom and 1 for dad. That's what he told you.
>
> A Yep.
>
> Q I mean that's -- he was -- how -- how can we – how can we interpret that any other way than his recollection to you is he was going to kill his mom and dad.
>
> A I agree. I think this case is fraught with inconsistencies. And I know what he said. And -- and I -- he also said --

14

Q  Okay.  Let me just stop you just for a second if you don't mind. "I -- I -- I didn't have no real motive for it.  I just done it."

A  Yes.

Q  "When you ain't [sic] feeling good about your own life, you put it out on your mom and dad."  He told you why he did it; didn't he?

A  He told me how he's putting it together at that point in time.  I think it's fair to say that I certainly didn't leave this kind of information out- of  my report. I know that this raises questions. It raised questions in my mind.  I have to put it together.  This is what he said and this is after the fact.  After the fact an individual who shot and killed  someone, if they're psychotic and delusional at the point in time and they clear some, they have to put it together in their own mind, too. He's put it together in a number of different ways.  And this was one of the ways he -- he told me one thing, he told other -- you know professionals other things.  This is what he said at that point in time.  I agree.  Then he said "I thought I would be a warrior. I'm going to shoot mom and dad, maybe it was a movie I was watching.  I didn't have no real motive for it."  Maybe it's a movie he's watching? What does that have to do with anything?  And it's -- but -- that -- it's in that same statement.  Maybe it's a movie I was watching.  But -- but -- so he's been consistent in his inconsistencies.  I -- I don't know how else to put it.  He's either inconsistent because he's manipulative, lying and malingering in his own best interest in trying to get out of. But if that's the case wouldn't look like this.  He's not doing a very good job of it.  It's in the context of Psychosis.  He's so disorganized he's not able to give a coherent history of the events that occurred. It's changed what in this evaluation, in the account of the incidents with the detectives.  I'm sorry I -- prognosticate.

Dr. Anderson agreed that leaving the crime scene and disposing of the weapon were behaviors that one would expect from an individual who knew what he did was wrong.

Dr. Charles Vosburg, an expert in forensic psychology, evaluated Defendant to determine whether he was competent to proceed to trial and determined Defendant was competent to proceed.  He reassessed Defendant after he returned from the forensic hospital and again found Defendant competent to proceed.  Dr. Vosburg used the same records as Dr. Anderson in determining Defendant's sanity at the time of the offenses.  He testified that Defendant is a "very, very fragile schizophrenic."  Dr. Vosburg met with Defendant on March 21, 2011, to evaluate

15

his sanity at the time of the offenses. Dr. Vosburg testified that during the three times he met with Defendant, Defendant never said he shot his mother and father because he was angry with them.

Dr. Vosburg testified that:

it's not a clear cut 100 percent but I err on the side that he did not know right from wrong at that time, because in my opinion the preponderance of the evidence indicates me to lean that way – or suggests that the data that I have seen would suggest that given my experience with similar cases and my history of evaluating these individuals and what he presented to me.

He indicated his opinion was based on a reasonable degree of psychological certainty and rose to the level of more probable than not. Dr. Vosburg agreed that at some time after the offenses occurred, Defendant realized something happened.

Dr. Vosburg stated that during the interview, Defendant's thoughts were disorganized; he was naive, gullible, and easily led. Defendant could be "slightly pressed into agreeing with a variety of things because of his childlike orientation." Dr. Vosburg testified that he believed a person could be actively psychotic and still be legally sane.

Dr. George Seiden was accepted as an expert in forensic psychiatry. Dr. Seiden was employed by the State a month or two prior to September 2009 to render an opinion as to Defendant's sanity at the time of the offenses. Dr. Seiden diagnosed Defendant with paranoid schizophrenia. Dr. Seiden opined that despite Defendant's psychotic illness, he was capable of distinguishing right from wrong at the time he shot his parents; thus, he was sane at that time. Dr. Seiden testified that a person can be psychotic and still meet the standard for sanity.

Before making his determination, Dr. Seiden interviewed Defendant for two hours at his office in Shreveport. Dr. Seiden noted Defendant had a flat affect, as schizophrenics do not display emotion in their faces. Dr. Seiden also noted

16

Defendant had occasional derailment of thought, which meant he put thoughts together that did not seem to go together. He further noted paranoid delusions. Dr. Seiden testified that Defendant's ability to recall and relate facts pertaining to his actions and whereabouts was impaired. Dr. Seiden stated that Defendant provided varying versions of the events of the night in question. Further, he was not capable of testifying. At the time of the evaluation, Dr. Seiden was not sure Defendant could be restored to competency in the foreseeable future.

Dr. Seiden relied on the statements Defendant made during the interview to determine he was sane at the time of the commission of the offenses. Defendant told Dr. Seiden he was angry at his father, angry enough that he wanted to kill him. Further, he shot his mother because he felt she was at fault, too. Dr. Seiden was aware that Defendant never told police he was mad at his parents.

Dr. Seiden testified that Defendant assaulted his father and threatened to kill his parents in 1998. His mother stated it was "yet one more time that Joel was trying to leave and his father intervened." Defendant's father tried to stop him, and it resulted in a physical altercation in which Defendant threatened to kill his parents. Dr. Seiden testified there were similar periodic episodes.

Dr. Seiden testified Defendant gave various versions of his confrontation with his father. However, Defendant was consistent in stating that he shot his father then his mother. As soon as he did that, he grabbed the keys, the shotgun, the shells, and ran. In Woodville, he told police he was not walking on the road because he was afraid someone would see him, which was another indication he knew he had done something wrong.

Dr. Seiden testified that Defendant was always schizophrenic and was variably psychotic, but how psychotic he was could change from time-to-time but not moment-to-moment. Dr. Seiden testified there would be a gradual

deterioration and a gradual improvement. He said, "it is over days that mental status changes."

Dr. Seiden further testified regarding what he considered in making his determination as follows:

> A  Well, what has been described is that he shot his father and then shot his mother. Immediately ran and got his keys, the shells to the shotgun, and left the house, got in the truck, drove to the first bridge where he could throw the gun -- the gun and the shells away and threw them over the bridge into a creek and then left. And he made a statement -- he explained that by -- behavior by saying that he left because he -- you know wanted to call 911 but he knew that he would be in trouble. And that if anyone showed up and saw what he did they would -- they would be -- they would be in outrage. And so he knew, he wanted to go back, but he knew that he couldn't because of -- because of the potential consequence to him if he returned to the scene of what he at some point described as a massacre.
>
> Q  He also expressed some fear of retribution by family members; did he not?
>
> A  Well -- well that's what I meant by the – the consequences.
>
> Q  I'm sorry. Okay. Now after he left, throws the gun away, what -- what are your thoughts about what he ended up doing from there on?
>
> A  Well then he kept driving and he -- he at some point made the statement he knew he couldn't come back again because of the consequences. And he drove till he ran out of gas, and then got out and walked off the road as I said before. And he was off the road because he was afraid that people were looking for him. And he didn't want to be found. And so again that – there's this consistent pattern that -- that for me is hard to explain any other way. Even with his psychotic disorder.

Dr. Seiden testified that his opinion was pretty strong: more likely than not, with reasonable medical certainty, Defendant knew right from wrong at the time of the offenses.

In support of his argument that he was not sane at the time of the offenses, Defendant contends the State failed to rebut the testimony of Drs. Anderson and Vosburg, finding that he did not know right from wrong at the time of the commission of the offenses. Defendant contends that if he left home trying to

18

evade authorities, he would have taken his wallet and money with him, would not have given the Woodville police officer his correct name, and would not have drawn a map to where the shotgun and shells were disposed of. Further, if he knew he killed his mother and father, he would not have sat down and tried to write them a letter.

The State contends the most compelling evidence against Defendant was his own words and actions following the crimes. The State asserts that after Defendant shot his parents, he took the gun and some shells and left the scene. He then threw the items over a nearby bridge and drove to Mississippi, where he hid out for several days. In support of its claim that Defendant's actions indicated he knew right from wrong, the State cites *State v. Armstrong*, 94-2950, p. 13 (La. 4/8/96), 671 So.2d 307, 313, in which the supreme court noted, "Indeed, the most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime." The State maintains that Defendant's own expert, Dr. Anderson, testified that things done by Defendant such as leaving the scene and throwing away the gun were behaviors that indicated he knew right from wrong.

The State notes that following his arrest, Defendant gave a statement wherein he indicated he knew he had done something wrong. The State further notes this admission came after Defendant first attempted to explain the shooting of his father as accidental.

The State points out that another expert called by Defendant, Dr. Vosburg, admitted that the sanity issue was a close question, and he chose to err on the side of finding that Defendant was insane. The State contends the jury chose to believe the testimony of Dr. Seiden, who testified that Defendant knew right from wrong at the time of the offenses.

There is no question that Defendant had been suffering from schizophrenia for a long time and took medication for that illness. Several lay witnesses testified regarding his mental health history and his actions prior to and after September 6, 2007.

Dr. Anderson opined that Defendant did not know right from wrong when he committed the offenses. However, Defendant's behavior after the offenses was what one would expect from an individual who knew right from wrong. Dr. Vosburg also opined that Defendant did not know right from wrong at the time he committed the offenses. However, Dr. Vosburg testified that the issue was not one hundred percent clear cut, and he erred on the side that Defendant did not know right from wrong. He further stated that data he reviewed placed his determination slightly over the line toward insanity, but there were some factors that would indicate that Defendant was sane.

Despite Dr. Seiden's failure to view the video of Defendant's statement to police and review the letters that Defendant wrote prior to committing the offenses, he opined that Defendant was sane at the time he committed the offenses.

In *State v. Sharp*, 418 So.2d 1344, 1348 (La.1982), the supreme court stated:

> In the present case, the evidence (particularly the medical evidence) was in substantial conflict, and there was ample evidence to support either verdict the jury decided to render. When there is conflicting evidence on the issue of insanity at the time of the offense, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence (as long as the jury was properly instructed and no evidence was prejudicially admitted or excluded), and the jury's verdict should not be overturned *unless no* rational juror could have found, on the evidence viewed in the light most favorable to the prosecution, that defendant failed to prove by a preponderance of the evidence his insanity at the time of the offense.

As in *Sharp*, 418 So.2d 1344, there was conflicting evidence regarding Defendant's sanity at the time he committed the offenses. We cannot conclude that the evidence was insufficient for the jury to reject the opinions of Drs.

20

Anderson and Vosburg that Defendant was insane when he shot his parents. The burden of proof was upon Defendant, and the jury's finding that that he failed to carry that burden was not without support in the record. Thus, this assignment of error lacks merit, and Defendant's convictions are affirmed.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends the trial court erred in denying his motion for new trial. In his motion for new trial, Defendant asserted the verdict was contrary to the law and the evidence.

The denial of a new trial based upon La.Code Crim.P. art. 851(1) is not subject to review on appeal. *State v. Giles*, 04-359 (La.App. 3 Cir. 10/6/04), 884 So.2d 1233, *writ denied*, 04-2756 (La. 3/11/05), 896 So.2d 62.

## DECREE

Defendant's convictions are affirmed.

**AFFIRMED**.